## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SELECT SPECIALTY HOSPITAL – DENVER, INC.
1719 E. 19th Avenue
Floor 5
Denver, CO 80218,

SELECT SPECIALTY HOSPITAL – FORT SMITH,
INC.
1001 Towson Avenue
Fort Smith, AR 72901,

SELECT SPECIALTY HOSPITAL – JEFFERSON
PARISH, INC.
4200 Houma Blvd., 5th Floor South
Metairie, LA 70006,

SELECT SPECIALTY HOSPITAL – ORLANDO, INC.
2250 Bedford Road
Orlando, FL 32803,

SELECT SPECIALTY HOSPITAL – WILMINGTON,
INC.
7th & Clayton Street, 5th Floor
Wilmington, DE 19805,

        Plaintiffs,

    v.

KATHLEEN SEBELIUS, Secretary
United States Department of Health and Human Services
200 Independence Avenue, S.W.
Washington, DC 20201,

        Defendant.

Civil Action No.

COMPLAINT FOR REVIEW OF
AGENCY ACTION

## INTRODUCTION

1.    This action arises under Title XVII of the Social Security Act, 42 U.S.C. §

1395oo(f), which grants Plaintiffs the right to judicial review of any action of the Secretary's

fiscal intermediary which involves a question of laws or regulations.

2.      Before filing this Complaint, the Plaintiffs received a final agency determination from the Administrator of the Centers for Medicare & Medicaid Services ("CMS") (the "Administrator") who reversed a decision of the Provider Reimbursement Review Board ("PRRB" or "Board"), an entity within the Department of Health and Human Services ("HHS").

3.      By filing this complaint, Plaintiffs Select Specialty Hospital - Wilmington, Inc., Select Specialty Hospital - Jefferson Parish, Inc., Select Specialty Hospital - Fort Smith, Inc., Select Specialty Hospital - Denver, Inc., and Select Specialty Hospital - Orlando, Inc., (collectively, the "Plaintiffs"), seek to set aside the Administrator's decision that CMS's so-called must-bill policy applies to Plaintiffs' dual eligible bad debts despite the fact that it was impossible for Plaintiffs to comply with the must-bill policy because they did not participate in Medicaid and thus were unable to bill Medicaid and to obtain Medicaid remittance advices ("RAs").

4.      The total amount in controversy is $438,693.  The applicable periods at issue are the Plaintiffs' respective cost reporting periods: Select Specialty Hospital - Wilmington, Inc. (cost reporting period with fiscal year end ("FYE") 7/31/2005); Select Specialty Hospital - Jefferson Parish, Inc. (cost reporting period with FYE 8/31/2005); Select Specialty Hospital - Fort Smith, Inc. (cost reporting period with FYE 8/31/2005); Select Specialty Hospital - Denver, Inc. (cost reporting period with FYE 9/30/2005); and Select Specialty Hospital - Orlando, Inc. (cost reporting period with FYE 12/31/2005) (collectively, "cost reporting periods at issue").

5.      The Defendant's application of the must-bill policy, or failure to recognize an exception to such policy, under these circumstances – where Plaintiffs do not participate, and in many instances are unable to participate, in Medicaid – has harmed Plaintiffs by denying reimbursement for their bad debt claims of dual eligible beneficiaries in violation of the

Medicare cost-shifting prohibition.

6.      Plaintiffs request that the Court rule that the must-bill policy as applied to non-Medicaid-participating health care providers is invalid as a matter of law and direct that the Secretary, through the Medicare contractor responsible for payment to Plaintiffs, Wisconsin Physicians Service Insurance Corporation (formerly Mutual of Omaha) (the "Intermediary"), pay Plaintiffs the amount of their outstanding bad debts for dual eligible beneficiaries.

## JURISDICTION AND VENUE

7.      This action arises under Title XVIII of the Social Security Act, as amended, 42 U.S.C. § 1395 *et seq.* (the "Medicare Act") and the Administrative Procedures Act ("APA"), 5 U.S.C. § 551 *et seq.*

8.      Jurisdiction is proper under 42 U.S.C. § 1395oo(f).

9.      Venue is proper in this judicial district under 42 U.S.C. § 1395oo(f)(1).

10.     This Court has authority to grant the relief requested under 42 U.S.C. § 1395oo(f).

## PARTIES

11.     Plaintiff Select Specialty Hospital – Wilmington, a subsidiary of Select Medical Holdings Corporation ("Select"), is a Medicare-certified long-term care hospital (Medicare Provider No. 08-2000) that operates in Wilmington, Delaware.

12.     Plaintiff Select Specialty Hospital – Jefferson Parish, a subsidiary of Select, is a Medicare-certified long-term care hospital (Medicare Provider No. 19-2030) that operates in Jefferson Parish, Louisiana.

13.     Plaintiff Select Specialty Hospital – Fort Smith, a subsidiary of Select, is a Medicare-certified long-term care hospital (Medicare Provider No. 04-2006) that operates in Fort Smith, Arkansas.

14.     Plaintiff Select Specialty Hospital – Denver, a subsidiary of Select, is a Medicare-

certified long-term care hospital (Medicare Provider No. 06-2015) that operates in Denver, Colorado.

15.     Plaintiff Select Specialty Hospital – Orlando, a subsidiary of Select, is a Medicare-certified long-term care hospital (Medicare Provider No. 10-2003) that operates in Orlando, Florida.

16.     Defendant Secretary Kathleen Sebelius is the Secretary of HHS and is sued in her official capacity.  The Secretary is responsible for the administration of the Medicare program. The Secretary exercises the administrative responsibility of the Medicare program primarily through CMS, an agency of HHS.   The Secretary also contracts with private organizations to act as fiscal intermediaries (now being transitioned to Medicare Administrative Contractors, or "MACs") for Part A of the Medicare program.  Wisconsin Physicians Service Insurance Corporation, formerly known as Mutual of Omaha, was the Medicare-contracted fiscal intermediary to the Plaintiff hospitals during the relevant cost reporting periods.

**MEDICARE PAYMENT FOR LONG-TERM CARE HOSPITAL SERVICES**

17.     The Medicare Act establishes a system of health insurance for the aged and the disabled.  The program is administered in two parts:  Medicare Part A, which provides hospital insurance coverage to all qualified beneficiaries and Medicare Part B, which provides medical insurance coverage for services such as physician's services, outpatient services, and home health care. Participation under Part B is voluntary and beneficiaries must pay monthly premiums.

18.     Under Part A of the Medicare Act, an eligible Medicare beneficiary is entitled to have payment made by the Medicare Program on his or her behalf for, *inter alia,* inpatient hospital services provided to him or her by a hospital participating in the Medicare Program as a

"provider of services."

19.     Pursuant to 42 U.S.C. § 1395cc, Plaintiffs entered into a written agreement with the Secretary to provide hospital services to eligible individuals.

20.     CMS, through its fiscal intermediaries or MACs, pays hospitals participating in the Medicare program.  *See* 42 U.S.C. § 1395ww.  The amount of payment owed to a hospital for services furnished to Medicare beneficiaries is determined by the fiscal intermediary or MAC acting as an agent of the Secretary.  *See* 42 U.S.C. § 1395h.

21.     Under the Medicare program, different payment methodologies are used to reimburse different types of providers.  Accordingly, the Medicare payment system for the Plaintiffs' long-term care hospitals ("LTCHs") is different than the system applicable to general acute care hospitals.

22.     Medicare payment for both the operating and capital-related costs of hospital inpatient stays in an LTCH are based on a prospective payment system ("LTCH-PPS") established by section 123 of the Medicare, Medicaid, and SCHIP Balanced Budget Refinement Act of 1999 ("BBRA"), as amended by section 307(b) of the Medicare, Medicaid, and SCHIP Benefits Improvement and Protection Act of 2000 ("BIPA").

23.     Under LTCH-PPS, the Medicare program provides a single payment amount to hospitals for each inpatient discharge, which are identified by the long-term care diagnosis related group ("LTC-DRG")[1] into which each case is classified.

24.     Medicare pays general acute care hospitals for their inpatient costs under a different payment system – the Medicare inpatient prospective payment system or "IPPS."  Like

---

[1] As of October 1, 2008, for LTCHs, CMS changed to Medicare-severity LTC-DRGs or "MS-LTC-DRGs" to take into account the severity of the patient's condition.  See 72 Fed. Reg. 47130 (Aug. 22, 2007).

the LTCH-PPS, the IPPS reimburses general acute care hospitals a fixed payment amount per discharge (adjusted for area wage differences) using diagnosis related groups ("DRGs").[2] *See* 42 C.F.R. § 412.60.

25.     Although the average length of stay varies for each DRG, the average stay of all Medicare patients in a general acute care hospital is approximately <u>six days</u>.  Thus, the prospective payment system for general acute care hospitals is not designed to reimburse hospitals on a regular basis for long-stay hospital care.

26.     Hospitals enrolled in the Medicare program as an LTCH are required to have an average Medicare inpatient length of stay that is greater than <u>twenty-five days</u>, which reflects the medically complex cases treated in LTCHs.  *See* 42 C.F.R. § 412.23(e)(2).

27.     For these reasons, most of the LTC-DRGs for LTCHs are the same as the DRGs for general acute care hospitals, but the weights are generally higher to account for greater resources utilized for patient care in LTCHs and the longer length of patient stays.  Accordingly, the federal standard rate has been much greater for LTCHs than for general acute care hospitals: $36,833.69 under the LTCH-PPS in rate year 2005, compared to $4,555 under the IPPS in fiscal year 2005.  *See* 69 Fed. Reg. 48916, 48982 (Aug. 11, 2004); *see also* Testimony of Herb Kuhn, Director, Center for Medicare Management, Centers for Medicare and Medicaid Services, Subcommittee on Health, Committee on Ways and Means, United States House of Representatives, March 15, 2006.

28.     Certain costs are excluded from the LTCH PPS and continue to be paid on the basis of reasonable cost, namely:  bad debts, blood clotting factors, direct medical education,

---

[2] As of October 1, 2008, for general acute care hospitals, CMS changed to Medicare-severity DRGs or "MS-DRGs" to take into account the severity of the patient's condition.  <u>See</u> 72 Fed. Reg. 47130 (Aug. 22, 2007).

anesthesia services, and the cost of photocopying and mailing medical records requested by a

Quality Improvement Organization ("QIO").  *See* 42 C.F.R. § 412.521.

## BAD DEBT AND REASONABLE COLLECTION EFFORTS

29.     Medicare does not cover the full cost of medical care.  Medicare beneficiaries are

charged certain amounts for which they are liable.  For example, a Medicare beneficiary is

charged a fixed deductible amount when he or she receives Medicare-covered inpatient services

in a hospital for the first time in a benefit period (*see* 42 C.F.R. § 409.82), and is charged an

inpatient co-insurance amount for each day after the first 60 days of an inpatient stay for a

benefit period (*see* 42 C.F.R. § 409.83).

30.     Medicare regulations define "bad debts" as the "amounts considered to be

uncollectible from accounts and notes receivable that were created or acquired in providing

services.  'Accounts receivable' and 'notes receivable' are designations for claims arising from

the furnishing of services, and are collectible in money in the relatively near future."  42 C.F.R. §

413.89(b)(1).  These debts include any unpaid Medicare deductibles and coinsurance obligations.

*Id.* § 413.89(d).

31.     Medicare regulations entitle a hospital to reimbursement of these deductibles and

co-insurance amounts by the Medicare program as "bad debts" if the hospital is not able to

collect these amounts from the Medicare beneficiaries.  *See* 42 C.F.R. § 413.89.

32.     Federal regulations establish certain criteria for "allowable" bad debt (*i.e.*, bad

debt that is reimbursable under Medicare) as follows:  (1) the debt must be related to covered

services and derived from deductible and co-insurance amounts; (2) the provider must be able to

establish that reasonable collection efforts were made; (3) the debt was actually uncollectible

when claimed as worthless; and (4) sound business judgment established that there was no

likelihood of recovery at any time in the future.  *See* 42 C.F.R. § 413.80(e).  As long as the bad

debt meets these criteria, a health care provider is entitled to Medicare reimbursement for the

amounts.  *See* 42 C.F.R. § 413.89(d).

33.     A "reasonable collection effort" is defined as an effort similar to what a provider

would make to collect accounts receivable from a non-Medicare beneficiary.  *See* Provider

Reimbursement Manual ("PRM") (CMS-Pub. 15) § 310. Generally, CMS presumes that

"reasonable collection efforts" are exhausted, and that the debt is uncollectible, after 120 days

have passed without payment since the first bill was issued, in spite of reasonable and customary

efforts to bill the beneficiary for the cost-sharing amounts.  PRM § 310.2.

### COLLECTION EFFORTS FOR DUAL ELIGIBLE BENEFICIARIES: THE MUST-BILL POLICY

34.     Providers are excused from pursuing reasonable and customary collection efforts

if they can establish that the beneficiary is indigent and that "no other source other than the

beneficiary would be legally responsible for the beneficiary's medical bill" such as the state

Medicaid program.  PRM § 312.

35.     Persons who are eligible for both Medicare and Medicaid benefits under their

state Medicaid program (referred to herein as "dual eligible beneficiaries") are generally deemed

to be indigent.  *Id.*  With respect to ensuring that no other sources of payment are available, if the

state Medicaid program has a legal obligation to pay all, or any part, of the Medicare cost-

sharing amounts, the amounts are not considered to be allowable bad debts under Medicare.

PRM § 322.

36.     Although state Medicaid programs are administered separately from Medicare,

the Social Security Act requires them to pay Medicare cost-sharing amounts for poverty-level

Medicare beneficiaries.  *See* 42 U.S.C. § 1396d(p)(3).

37.     In instances where providers participate in state Medicaid programs, the CMS policy is that the Medicare bad debt regulation at 42 C.F.R. § 413.89 requires providers to bill Medicaid in order to confirm that the state will not pay the Medicare cost-sharing amounts on behalf of the dual eligible beneficiary.  This has become known as CMS's must-bill policy.

38.     Billing the state Medicaid program was not always required.  In fact, prior published instructions for filling out form HCFA-339 (Provider Cost Report Reimbursement Questionnaire) stated that, "it may not be necessary for a provider to actually bill the Medicaid program to establish a Medicare crossover bad debt where the provider can establish that Medicaid is not responsible for payment.  In lieu of billing the Medicaid program, the provider must furnish documentation of [Medicaid eligibility and non-payment that would have resulted from billing Medicaid]."  Plaintiffs followed this documentation process and maintained records of proof of the patients' indigent status in support of their bad debt claims.

39.     The Plaintiffs were reimbursed for their Medicare bad debts prior to April 2007 without having to bill the state.  However for the FY 2005 cost reports at issue in this case, the Defendant, acting through the Intermediary, abruptly changed its audit treatment of Medicare bad debts citing the must-bill policy.  Plaintiffs received no prior written notice of this change in policy.

## MEDICAID TREATMENT OF MEDICARE COST-SHARING AMOUNTS – PAYMENT CEILINGS

40.     Under 42 U.S.C. § 1396a(n), a state Medicaid program may impose a "payment ceiling" on the amount of Medicare cost-sharing it will cover.  The ceiling may limit Medicaid's payment of the dual eligible beneficiary's coinsurance and deductible to the difference between the amount it would have paid for the service if the person had not been enrolled in Medicare, and what Medicare actually paid for the service.

41.   If the Medicare cost-sharing obligation is more than the amount that Medicaid

will pay under the payment ceiling, the balance becomes Medicare-reimbursable bad debt,

(assuming all the bad debt requirements, which were previously expressed in Paragraph 31, are

satisfied).

42.   To illustrate how such a payment ceiling specifically generates Medicare-

reimbursable bad debt, the Ninth Circuit set forth the following examples:

> Suppose the following facts: (1) a hospital incurs a cost of $100 in
> providing services to a crossover [dual eligible] patient.   (2)
> Medicare, under Part B, pays $80 of that cost.   The amount
> representing the coinsurance and/or deductible usually paid by a
> non-crossover Part B enrollee is $20.  If Medi-Cal [the California
> Medicaid program] determines that it would only pay $60 for the
> care provided to the crossover patient if the patient were not
> enrolled in Part B, then it will pay none of the
> deductible/coinsurance to the health care provider (60-80 < 0,
> therefore Medi-Cal pays none of the $20 coinsurance/deductible).
> However, if Medi-Cal determines that it would have paid $90 of
> the covered service, then it will pay the provider $10 of the
> deductible/coinsurance (90-80 = 10, therefore Medi-Cal pays for
> $10 of the $20 coinsurance/deductible).   In these examples, the
> health care provider is shortchanged by $20 and $10 respectively.
> To prevent cost-shifting, Medicare, through the Intermediary,
> reimburses the provider for the amount over the Medi-Cal cost
> ceiling as a bad debt.

*Cmty. Hosp. of Monterey v. Thompson,* 323 F.3d 782, 786 (9th Cir. 2003).

43.   CMS applies 42 C.F.R. § 413.89(e)(2)-(3) as a must-bill policy regardless of

whether the state Medicaid program has a payment ceiling that generates Medicare-reimbursable

bad debt. *See e.g., Summer Hill Nursing Home v. Mutual of Omaha*, CMS Administrator

Decision (Dec. 20, 2007), reversing PRRB Hearing Dec. No. 2008-D5, Case No. 06-1478 (Nov.

1, 2007).

44.   CMS takes the position that even though the provider may know that the state

Medicaid program will not pay the Medicare cost-sharing amount on behalf of the beneficiary

and that the amount will ultimately become allowable bad debt, the provider can not formally

write off the amount as Medicare bad debt until it bills the state Medicaid program and receives a "remittance advice" stating that the state Medicaid program will not cover any portion of the bad debt. A Medicaid remittance advice is a document that Medicaid generates (generally, through contractors) for processed claims submitted by Medicaid-participating providers which indicates the amount (if any) that the Medicaid program will pay.

45.     The futility of this exercise has been properly recognized in numerous PRRB decisions. PRRB decisions over the last eight years or more have consistently held that the CMS must-bill policy is not supported by statute or regulation. In each of these cases, the PRRB has properly reversed intermediary adjustments that rely on the must-bill policy and require billing states for Medicare cost-sharing amounts.

### THE MUST-BILL POLICY'S RA REQUIREMENT

46.     CMS has imposed additional requirements in connection with the must-bill policy. According to CMS, for a provider to be reimbursed for allowable bad debt, the provider must bill the state Medicaid program and the state Medicaid program must process and refuse to pay the claim. In addition, CMS requires that this refusal to pay must be in the form of an RA. *See* CMS Joint Signature Memorandum ("JSM") 370 (Aug. 10, 2004).

47.     The policy of requiring an RA is inconsistent with prior published instructions for filling out form HCFA-339 (Provider Cost Report Reimbursement Questionnaire) which did not require RAs in situations where the provider could establish that Medicaid had no responsibility to pay the provider for the cost-sharing amounts.

48.     The policy of requiring an RA as a condition of reimbursement for bad debt is also inconsistent with the Intermediary's prior practice and audit treatment of the Plaintiffs' dual eligible bad debt claims. Prior to April 2007, the Defendant, acting through the Intermediary,

did not require Plaintiffs, as non-Medicaid-participating providers, to bill the state, or obtain an RA, to be reimbursed for their dual eligible bad debt claims.  Rather, the Intermediary accepted documentation furnished by Plaintiffs as proof of the patients' indigent status for reimbursement of their dual eligible bad debt claims.

## COST-SHIFTING PROHIBITION

49.     The Social Security Act ("SSA") prohibits the Medicare program from shifting Medicare costs for which beneficiaries are responsible, to non-beneficiaries (i.e., "cost shifting"). See 42 U.S.C. § 1395x(v)(1)(A) (requiring the implementing regulations for reasonable cost reimbursement to "take into account both direct and indirect costs of providers of services . . . in order that, under the methods of determining costs, the necessary costs of efficiently delivering covered services to individuals covered by the insurance programs established by this title will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by such insurance programs . . . ."); 42 C.F.R. §§ 413.50; 413.89(d).

50.     For Part A-enrolled Medicare beneficiaries, who are responsible for paying Medicare coinsurance and deductible amounts (42 C.F.R. § 409.80(a)(2)), Medicare reimburses a provider where such amounts are uncollectible from the beneficiary.  See 42 U.S.C. § 1395x(v)(1)(A)(i); 42 C.F.R. § 413.89(d).  Failure to do so would result in inappropriate cost shifting and would violate the SSA.

51.     As such, the Medicare cost-shifting prohibition is specifically addressed in the Medicare regulations governing bad debt:

> Under Medicare, costs of covered services furnished beneficiaries are not to be borne by individuals not covered by the Medicare program, and conversely, cost of services provided for other than beneficiaries are not to be borne by the Medicare program. Uncollected revenue related to services furnished to beneficiaries of the program generally means the provider has not recovered the cost of services covered by that revenue.  The failure of beneficiaries to pay the deductible and coinsurance amounts could

> result in the related costs of covered services being borne by other than Medicare beneficiaries. **To assure that such covered service costs are not borne by others, the costs attributable to the deductible and coinsurance amounts that remain unpaid are added to the Medicare share of allowable costs.**

42 C.F.R. § 413.89(d) (emphasis added); *see also* PRM § 304 ("Payment for deductibles and coinsurance amounts is the responsibility of the beneficiaries. However the inability of the provider to collect deductibles and coinsurance amounts from beneficiaries of the Program could result in part of the costs of covered services being borne by others who are not beneficiaries of the Program.").

52.    Applying the must-bill policy to non-Medicaid-participating providers violates the cost-shifting prohibition and should be declared legally invalid.

## EXCEPTIONS TO THE MUST-BILL POLICY

53.    CMS recognizes at least two exceptions to the must-bill policy.

54.    The first exception relates to community mental health centers ("CMHCs") in California. CMHCs are not licensed by the state and therefore cannot enroll in the state Medicaid program ("Medi-Cal") or have their Medi-Cal claims processed. The Secretary permits CMHCs to claim Medicare dual eligible bad debts without billing the state Medicaid agency. As such, they are not subject to the reasonable collection efforts requirement of 42 C.F.R. § 413.89(e)(2) as enforced through the must-bill policy.

55.    The second exception to the must-bill policy relates to institutes for mental diseases ("IMDs") which are hospitals, nursing facilities or institutions that provide care for persons with mental diseases. The Secretary permits IMDs to claim Medicare dual eligible bad debts without billing the state Medicaid agency when the services were provided to individuals age 22 to 65. The rationale stated by the agency, for permitting bad debt payment to IMDs without the prerequisite of billing Medicaid, is that the Medicaid statute and the regulations

preclude payment for IMD services provided to patients between those ages.  Therefore, the state

has no responsibility to pay the cost-sharing amounts associated with those services and billing

the state would be futile.

56.     The same rationale applies to the Plaintiffs and should exempt the Plaintiffs from

the recent interpretation of the must-bill policy's requirements.  As of the date of the Plaintiffs'

last filing with the PRRB, the following states would not enroll Select LTCHs in Medicaid:

Alabama, New Jersey, Pennsylvania, Arkansas, North Carolina, and Delaware.[3]  As LTCHs,

they were not a recognized Medicaid provider-type in these states.  As non-Medicaid-

participating providers, it would have been impossible and futile for the Plaintiffs to bill the

respective state Medicaid programs because the states had no mechanism to process Plaintiffs'

Medicaid bills or issue RAs to Plaintiffs.  Therefore, the states had no responsibility to pay the

cost-sharing amounts associated with those services.  Thus, similar to CMHCs and IMDs, the

Plaintiffs were precluded under Medicaid laws from receiving Medicaid payment for their

services.

57.     The Defendant's application of the must-bill policy to Plaintiffs, who were non-

Medicaid-participating providers, or refusal to recognize an exception to the must-bill policy

under these circumstances is arbitrary, capricious and inconsistent with existing policies which

exempt certain providers from the must-bill policy in circumstances where billing the state

would be futile or impossible.

## RETROACTIVE APPLICATION OF THE MUST-BILL POLICY WITHOUT PRIOR NOTICE TO PROVIDERS

58.     For the Plaintiffs' cost reporting periods prior to FY 2005, proof of indigence was

---

[3] Two of the five Plaintiffs in this complaint are located in these states.  Specifically, Select Specialty Hospital –
Wilmington, Provider No. 08-2000 is located in Delaware and Select Specialty Hospital – Fort Smith, Provider No.
04-2006 is located in Arkansas.

sufficient for the Intermediary to reimburse the Plaintiffs' non-Medicaid-participating hospitals

for dual eligible Medicare cost-sharing amounts as Medicare bad debts – Medicaid RAs were not

required as a condition of reimbursement for allowable bad debt claims.  This practice was

consistent with prior published Medicare instructions for filling out form HCFA-339 that

acknowledged that billing the Medicaid program is not necessary where a provider can establish

that Medicaid is not responsible for payment, which meant that Medicaid RAs are not required to

document allowable bad debts in every circumstance.

59.     Contrary to its treatment of bad debts in prior cost reporting periods, the

Intermediary abruptly and without official or proper notice changed its policy when auditing the

Plaintiffs' cost reports at issue, as set forth in Paragraph 4, insisting that cost-sharing amounts for

dual eligible beneficiaries of non-Medicaid-participating providers cannot be reimbursed as

Medicare bad debts without proof in the form of RAs that Medicaid actually denied claims for

such amounts.

60.     According to the Intermediary, the only acceptable manner of proving that the

state will not pay the Medicare cost sharing amount is for the provider to bill the state and the

state to send an RA to the provider showing that it is not liable for the cost-sharing amount, even

when the provider does *not* participate in the Medicaid program and has *no way* to obtain the

Medicaid RA.

61.     The Intermediary denied dual eligible bad debts claimed on these Plaintiffs' cost

reports for FY 2005 because they were not accompanied by Medicaid RAs.  This represents a

significant policy change without prior notice to the Plaintiffs.

62.     The Defendant, including its component CMS and contractor the Intermediary,

cannot impose new policies retroactively that have a substantive negative impact on Medicare

providers. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 215 (1988) (CMS cannot promulgate retroactive cost-limit regulations).

63.     The Intermediary's arbitrary retroactive application of the RA requirement on non-Medicaid-participating providers, including Plaintiffs, violates the basic premise that regulated parties must have some notice of an agency's new requirements and an opportunity to conform their conduct to the agency's requirements.

64.     Additionally, even if the Intermediary gave the Plaintiffs proper notice of the must-bill policy's requirement to submit claims to the states for dual eligible cost sharing amounts during their 2005 cost reporting periods, it was impossible for the Plaintiffs to obtain RAs from the states due to the fact that the Plaintiffs did not participate in Medicaid.

**MEDICARE COST REPORTING AND APPEALS PROCESS**

65.     At the end of the fiscal year, each hospital participating in Medicare must submit a cost report showing the operating and capital-related costs incurred by it during the fiscal year and the appropriate portion of those costs to be allocated to Medicare.  *See* 42 C.F.R. §§ 413.24, 413.50.  The hospital must submit its cost report in compliance with the Medicare Act and regulations.

66.     The Medicare cost report is reviewed or audited by each hospital's fiscal intermediary or MAC.  After completion of the fiscal intermediary's review or audit, the fiscal intermediary issues a Notice of Program Reimbursement ("NPR"), which informs the hospital of the final determination of its Medicare reimbursement for the cost reporting period in compliance with the Medicare Act and regulations.

67.     A hospital has a right to obtain a hearing before the PRRB by filing an appeal with the PRRB within 180 days of receiving its NPR if the hospital "is dissatisfied with a final

determination of the organization serving as its fiscal intermediary pursuant to section 1816 [of the Social Security Act] as to the amount of the total program reimbursement due the provider for items and services furnished to individuals for which payment may be made under this title for the period covered by such report." 42 U.S.C. § 1395oo(a)(1)(A)(i).  A group of commonly owned hospitals with a common issue can form a group appeal to the PRRB.  *See* 42 U.S.C. § 1395oo(b); *see also* 42 C.F.R. §§ 405.1837, 405.1839(b).

68.    The Secretary, through the Administrator of CMS, may elect to reverse, affirm, or modify the decision of the PRRB.  *See* 42 U.S.C. § 1395oo(f); *see also* 42 C.F.R. §§ 405.1837, 405.1839(b).

69.    Providers "have the right to obtain judicial review of any final decision of the PRRB, or any reversal, affirmance, or modification by the Secretary, by a civil action commenced within 60 days of the date on which notice of any final decision by the PRRB or of any reversal, affirmance, or modification by the Secretary is received." 42 U.S.C. § 1395oo(f).

## FACTS SPECIFIC TO THIS CASE

70.    The applicable periods at issue are the Plaintiffs' respective cost reporting periods: Select Specialty Hospital - Wilmington, Inc. (cost reporting period with fiscal year end ("FYE") 7/31/2005); Select Specialty Hospital - Jefferson Parish, Inc. (cost reporting period with FYE 8/31/2005); Select Specialty Hospital - Fort Smith, Inc. (cost reporting period with FYE 8/31/2005); Select Specialty Hospital - Denver, Inc. (cost reporting period with FYE 9/30/2005); and Select Specialty Hospital - Orlando, Inc. (cost reporting period with FYE 12/31/2005).

71.    At the time the services were provided, the Plaintiffs were not Medicaid providers since the Plaintiffs did not participate in their respective state Medicaid programs.  Prior to April 2007, the Intermediary did not require Plaintiffs or other Select hospitals that do not participate in state Medicaid programs to bill the state for Medicare cost-sharing amounts and obtain an RA

from the state in order to reimbursed for their bad debts by Medicare.

72.     However, in April 2007, the Intermediary abruptly changed its prior practice and audit treatment of bad debt claims by proposing adjustments to the Plaintiffs' cost reports at issue due to the absence of supporting Medicaid RAs.  The Intermediary referred to the Medicare bad debt must-bill policy, and insisted that the policy applies equally to both Medicaid-participating and non-Medicaid-participating hospitals.  The Plaintiffs were first verbally notified of this change in April 2007.

73.     In response to the policy change and pursuant to the Intermediary's instruction, the Plaintiffs attempted billing the states in order to determine whether the state Medicaid program would issue RAs in response to the Plaintiffs' bills.  The sample bills were accompanied by a letter from the Intermediary summarizing its new policy for Medicare reimbursement of allowable bad debts for non-Medicaid-participating providers.

74.     Select submitted a total of 402 sample billing claims in all of the states where it operated non-Medicaid-participating LTCH hospitals.

75.     Select preformed sample billing to the respective state Medicaid programs in all states where Plaintiffs in this complaint are located except for Select Specialty Hospital-Orlando ("SSH-Orlando").  SSH-Orlando obtained a Florida Medicaid provider number effective May 1, 2004 (which was after the dates of service related to the claims for bad debts at issue in this complaint).  Because the sample billing exercise used only current claims, SSH-Orlando was not included in the sample billing exercise.

76.     In each case, the states refused to issue RAs showing that Medicaid had processed and denied the Plaintiffs' claims.  Instead, the states provided written confirmation that the claims could not be recognized or processed and that the state had no liability for the claims

because Select's hospitals were not enrolled as Medicaid providers.

77.     Select has since attempted to enroll all LTCH hospitals, including the Plaintiffs in this complaint, in their respective state Medicaid programs so that they might be eligible to receive RAs in accordance with the Intermediary's interpretation of the must-bill policy on a going forward basis.

78.     Despite Select's efforts to comply with the Intermediary's must-bill policy, some state Medicaid programs will not allow for LTCH hospitals to enroll in Medicaid because they are not a recognized Medicaid provider-type in that state.

79.     The following chart reflects the efforts taken by Select to bill Medicaid as a non-Medicaid-participating provider as well as their attempts to enroll in Medicaid in the specific states relevant to this appeal and the current status of those enrollment attempts:

| State | Sample Billing Attempt | Result | Enrollment Attempt | Status |
|-------|------------------------|--------|--------------------|--------|
| **Arkansas** | Sample billing attempted. | Bills rejected. | Enrollment attempted. | Enrollment initially rejected in February 2008.  Enrollment accepted two years later, effective as of May 2010. |
| **Colorado** | Sample billing attempted. | Bills rejected. | Enrollment attempted. | Enrollment was pending for over a year prior to being accepted. Enrollment effective as of February 26, 2010. |
| **Delaware** | Sample billing attempted. | No response was received. | Enrollment attempted. | Enrollment rejected. |
| **Florida** | No attempt to sample bill was made because, by then, the Provider had enrolled in Medicaid. However, provider number was not effective for relevant dates of service. See supra, | n/a | Enrollment effective after relevant dates of service but before WPS review of FY 2005 cost report. | Enrollment effective as of May 1, 2004. |

| State | Sample Billing Attempt | Result | Enrollment Attempt | Status |
|-------|------------------------|--------|--------------------|--------|
|       | footnote 3.            |        |                    |        |
| Louisiana | Sample billing attempted. | Bills rejected. | Enrollment not attempted because hospital sold. | n/a |

80.    The Intermediary finalized the Plaintiff's cost reports with adjustments denying the Plaintiffs' dual eligible bad debts.  The approximate amount of reimbursement that the Intermediary denied and to which Plaintiffs are entitled under the regulations governing bad debt reimbursement, for the cost reporting periods at issue for each Plaintiff, are as follows:  Select Specialty Hospital - Wilmington, Inc.: $52,798; Select Specialty Hospital - Jefferson Parish, Inc.: $3,158; Select Specialty Hospital - Fort Smith, Inc.: $214,344; Select Specialty Hospital - Denver, Inc.: $149,077; and Select Specialty Hospital - Orlando, Inc.: $19,316.  The aggregate amount that Plaintiffs seek is $438,693, exclusive of interests, fees, and other costs.

81.    The Plaintiffs appealed the Intermediary's determinations to the PRRB.

## THE DECISION OF THE PROVIDER REIMBURSEMENT REVIEW BOARD

82.    At the administrative level, the issue before the PRRB was whether the CMS must-bill policy applies to the Plaintiffs' dual eligible bad debts when the Plaintiffs did not participate in the Medicaid program.

83.    After a hearing held on December 3, 2008, the PRRB issued a unanimous decision on April 13, 2010 reversing the Intermediary's adjustments and finding that the Intermediary's application of the must-bill policy to dual eligible bad debts when the provider did not participate in Medicaid programs was improper.

84.    The Board examined the regulations at 42 C.F.R. § 413.89 and the program guidance at PRM-I §§ 308,310, 312 and 322 that govern the recognition of Medicare bad debts

and determined that the Intermediary's application of the must-bill policy as an absolute requirement that the Plaintiffs obtain a Medicaid remittance advice prior to claiming Medicare bad debts is unsupported by the applicable law, regulations and manual provisions because it fails to recognize a non-Medicaid-participating provider's inability to comply.

85.    The Board found that there is no legal requirement that Medicare-certified hospitals enroll in Medicaid as a condition of participation in Medicare or to obtain Medicare reimbursement.  Further, the Board found that Medicaid will not process bills submitted by a provider if the provider is not enrolled as a Medicaid provider.  For these reasons, the Board found the must-bill policy is not intended to apply to dual eligible bad debt claims of non-Medicaid-participating providers, like the Plaintiffs.

86.    The Board also noted that CMS's must-bill policy requirement was issued to the intermediaries through a Joint Signature Memorandum (JSM 370) dated August 10, 2004 and referenced in the Intermediary's Medicare Newsletter dated October 15, 2004.  The Board found that the JSM is not an "appropriate vehicle to set policy and therefore is given little weight." **Exhibit A** at 9.  As a result, the Board found that the Intermediary changed its policy inappropriately because the JSM cannot be used as a means to communicate new instructions or provide clarification of existing requirements to intermediaries.  Further, even if the JSM was an appropriate means of communication, the Board found that the Plaintiffs would still prevail because the state is not legally responsible for paying bad debts of non-Medicaid-participating providers. *See Id.*

87.    The Board found next that the Intermediary's reliance case law (*i.e.,*, the Ninth Circuit's decision in the *Monterey Peninsula* case) to justify its decision was misplaced because the court in that case did not address the same circumstances applicable in this instance, *i.e.*, non-

Medicaid-participating providers for whom it is impossible to bill the state Medicaid program
and obtain RAs. *See* **Exhibit A** at 9 - 10.

88.     Last, the Board found that the Intermediary's "no exception" application to the
must bill policy is unfounded because CMS has recognized two other exceptions to the policy.
CMS has granted an exception to CMHCs because these institutions are not licensed by the state
and therefore cannot enroll in the state Medicaid program.  CMS has also granted an exception to
IMDs when the services are provided to an individual ages 22 to 64 because the Medicaid statute
does not provide for payment of services for individuals in this age group, thus, the state has no
responsibility for any cost sharing amounts for those services.  The Board found that the same
rationale applies to the Plaintiffs in this complaint.  Many states do not recognize LTCH
hospitals and will not enroll the Plaintiffs in the Medicaid program.  For these reasons, the Board
concluded that Plaintiffs, who are non-Medicaid-participating providers, should be exempt from
the must bill policy. *See* **Exhibit A** at 10.

89.     The PRRB decided that the Intermediary's must-bill policy has no foundation in
law and imposes duties and obligations greater than those required by the regulation and manual.
The PRRB also decided that application of the must-bill policy to dual eligible bad debts when
the provider did not participate in the Medicaid program is improper.  The PRRB reversed the
Intermediary's adjustments. *See* **Exhibit A** at 10.

## THE DECISION OF THE ADMINISTRATOR

90.     On behalf of the Defendant, the CMS Administrator Decision dated June 14, 2010
(the "Administrator Decision" or the "Decision"), reversed the PRRB's ruling that the
Intermediary's application of the must-bill policy to non-Medicaid-participating providers is
improper. *See generally* **Exhibit B**.

91.     The Administrator stated that, under Section 322 of the PRM, the amount that can be claimed as bad debt is the amount the state "does not pay" which presumes that the state has been billed and the state has rendered a determination on such a claim. *See* **Exhibit B** at 10.

92.     The Administrator Decision further stated that the Plaintiffs elected not to participate in Medicaid, which was a business decision by the Plaintiff.

93.     By not participating in Medicaid, the Administrator Decision stated that the Plaintiffs failed to determine if the states were liable for any cost sharing amounts and, thus, the Plaintiffs failed to determine that the debts were uncollectible when claimed as worthless as required under 42 C.F.R. 413.89(e)(3) and Chapter 3 of the PRM. *See* **Exhibit B** at 13.

94.     The Administrator Decision stated that "[t]he States have a statutory obligation to determine their cost sharing liability concerning dual eligible beneficiaries, regardless of the Medicare only status of the Providers providing the services." *Id.*

95.     The Administrator Decision asserted that even in cases where the provider has calculated that the states have no liability for the outstanding deductible and coinsurance amounts, the provider must bill the states and receive an RA before claiming a bad debt as worthless. The Decision contended that the states have the most current and accurate information to make a determination on beneficiary status at the time of the services and to determine the states' cost sharing liability for all covered stays of dual eligible beneficiaries. *See* **Exhibit B** at 14.

96.     The Administrator Decision concluded that the Plaintiffs have not demonstrated that the bad debts identified by the Plaintiffs were actually uncollectible and worthless. *See* **Exhibit B** at 15.

97.     The Administrator Decision also stated that the Plaintiffs have not shown that they have used reasonable collection efforts because the Plaintiffs did not enroll to be Medicaid providers.  According to the Administrator Decision, the Plaintiffs were aware of the Medicare bad debt reasonable collection efforts requirements and chose not to participate in the Medicaid program.  The Decision concluded that the Plaintiffs' business decision to not participate in the Medicaid program must necessarily include the decision that the Plaintiffs have foreclosed the payment of Medicare bad debts for dually eligible beneficiaries.  *See* **Exhibit B** at 16.

98.     The Administrator Decision also claimed that "the PRM requirement that the state be required to make a determination on any debts owed before it may be claimed as a Medicare bad debt has been in place for years prior to these cost years."  *Id.*

99.     The Administrator Decision stated that the PRM makes no distinction between Medicaid participating and non-participating facilities as the PRRB did in its decision.  *Id.*

100.    Last, the Administrator Decision acknowledges that IMDs and CMHCs are exempt from the must bill policy, but the Decision distinguishes the Plaintiffs from IMDs and CMHCs in stating that unlike CMHCs who are unable to enroll in the Medicaid program, Plaintiffs have made a choice not to enroll in Medicaid.  *See* **Exhibit B** at 18.

## FIRST CLAIM FOR RELIEF

101.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 100 above as if fully stated herein.

102.    Pursuant to 5 U.S.C. § 706(2)(A), this Court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ."

103.    The Administrator's decision that the Intermediary's application of the must-bill policy to Plaintiffs, non-Medicaid-participating providers, should be reversed because it is arbitrary, capricious, an abuse of discretion and not in accordance with law.

104.    First, the Administrator Decision should be reversed because the Plaintiff hospitals did, in fact, meet all statutory and regulatory requirements and follow the manual provisions for reimbursements of bad debt claims, and the Administrator erred in finding to the contrary.

105.    Second, the Administrator Decision erroneously held that the must-bill policy is applicable to bad debt claims of non-Medicaid-participating providers despite the fact that no Medicare statute, regulation or manual provision requires that the Plaintiffs bill the states and obtain an RA prior to submitting their bad debt claims.

106.    Third, until April 2007, Plaintiffs were reimbursed by Medicare for Plaintiffs' dual eligible bad debts without having to bill the state Medicaid program and obtain Medicaid RAs, despite the Administrator's claims that a state determination on such amounts is required before the amounts may be claimed as Medicare bad debts.

107.    Fourth, the Administrator Decision that requires Plaintiffs to bill the state Medicaid program and obtain Medicaid RAs in order to demonstrate its reasonable collection efforts for Medicare bad debts reimbursement is arbitrary and capricious since Plaintiffs did not participate in the state Medicaid program (and in some states they cannot participate in the state Medicaid program) and there was no mechanism for Medicaid to process Plaintiffs' bills and issue Medicaid RAs.

108.    Fifth, the Administrator Decision completely ignores the facts in the record that certain Plaintiffs would not have been permitted to enroll in the state Medicaid program, making

billing to Medicaid and receipt of Medicaid RAs an impossibility.

109.    Sixth, the Administrator Decision imposes a condition precedent for reimbursement of dual eligible bad debt claims that is impossible for the Plaintiffs, as non-Medicaid-participating providers, to satisfy.

110.    Seventh, the Administrator Decision places an improper condition precedent on Medicare-participating providers seeking Medicare reimbursement of dual eligible bad debts – to enroll in the *Medicaid* program – where there is no existing legal obligation to do so.

111.    Eighth, the Administrator Decision erroneously concluded that the states are the only agencies that can determine that dual eligible beneficiaries are indigent despite the fact that section 312 of the PRM establishes that Medicaid eligible beneficiaries are automatically deemed indigent.

112.    Ninth, the Administrator Decision violates the cost-shifting prohibition under the SSA,  42 U.S.C. § 1395x(v)(1)(A)(i), by shifting Medicare bad debt costs, not simply the cost of billing a state Medicaid program, to Plaintiffs.

113.    Tenth, the Administrator Decision finds that the must bill policy applies without exception to the Plaintiffs, yet the Decision acknowledges that CMS makes two exceptions to the must bill policy for IMDs and CMHCs, but erroneously concludes that the rationale behind the exceptions does not apply to Plaintiffs in this case.

114.    The Administrator Decision should be held unlawful and set aside as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law, and the Plaintiffs are entitled to full payment for their bad debt claims of dual eligible beneficiaries during the relevant periods, which total $438,693, before interest, fees and other costs.

## SECOND CLAIM FOR RELIEF

115.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 114 above as if fully stated herein.

116.    The Administrator's new interpretation of 42 C.F.R. § 413.89, which require non-Medicaid-participating providers to bill the state and obtain an RA prior to submitting their bad debt claims, is a substantive rule for which the Secretary failed to comply with notice and comment rulemaking under the APA.

117.    The APA, 5 U.S.C. §§ 500-576, requires that when a policy acts as a substantive rule and alters an existing regulatory scheme, the Secretary must adopt the policy according to procedures set forth in the APA.  Specifically, 5 U.S.C. § 553 requires the agency to provide the public with a meaningful opportunity to participate in the rulemaking process and compels publication or service of a substantive rule not less than 30 days before its effective date.

118.    The Administrator adopted a new policy which required the Plaintiffs to bill the state Medicaid program prior to submitting bad debt claims, which was a futile task for non-Medicaid-participating providers like Plaintiffs.  Such a policy does not otherwise appear in the Medicare Act or regulations or other federal or state law or regulation, and imposes an obligation that was not adopted pursuant to the notice and comment rulemaking provisions of the APA. Accordingly, this policy was invalid when relied upon to deny Plaintiffs' claims for dual eligible bad debts.

119.    The Administrator Decision should be held unlawful and set aside as creating a new substantive rule in violation of the APA's notice and comment rulemaking requirements, and the Plaintiffs are entitled to full payment of their bad debt claims of dual eligible beneficiaries during the relevant periods, which total $438,693, before interest, fees and other

costs.

## THIRD CLAIM FOR RELIEF

120.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 119 above as if fully stated herein.

121.    The Medicare Act, 42 U.S.C. § 1395hh, requires the Secretary to "provide for notice of the proposed regulation in the Federal Register and a period of not less than 60 days for public comment thereon."

122.    The interpretation of the must-bill policy is invalid as promulgated because it made substantive changes to an existing rule for which the Secretary failed to comply with notice and comment rulemaking under the Medicare Act.  Specifically, the recently adopted interpretation of the must-bill policy makes it impossible for non-Medicaid-participating providers – including Plaintiffs – to obtain reimbursement for their dual eligible bad debt claims by requiring that they must first bill the state and obtain an RA prior to submitting bad debt claims.

123.    The Defendant's improper adoption of the interpretation of the must-bill policy harmed Plaintiffs by making it impossible for them to receive reimbursement for their dual eligible bad debt claims.

124.    The Administrator Decision should be held unlawful and set aside as a violation of 42 U.S.C. § 1395hh, and the Plaintiffs are entitled to full payment of their bad debt claims for dual eligible beneficiaries during the relevant periods, which total $438,693, before interest, fees and other costs.

## FOURTH CLAIM FOR RELIEF

125.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 124 above

as if fully stated herein.

126.    Pursuant to 5 U.S.C. § 706(2)(E), this Court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute. . . ."

127.    The findings and conclusions of the Administrator Decision are unsupported by substantial evidence, including but not limited to the following:

 i. That a provider bill the state and receive a determination on the claim where the state is obligated either by statute or under the terms of its plan to pay all, or any part of the Medicare deductible or coinsurance amounts, as to non-Medicaid-participating providers, including Plaintiffs;

 ii. That the use of the phrase "the State does not pay" in section 322 of the PRM presumes that the state has been billed and that the state has rendered a determination in such a claim, even though it is impossible for non-Medicaid-participating providers like the Plaintiffs to submit a claim that can be processed by the state;

 iii. That an RA is the only way to show that the state will not pay claims, even though the state Medicaid programs have confirmed that they cannot and will not pay any claims submitted by non-Medicaid-participating providers;

 iv. That the states have a "statutory obligation" to determine cost sharing liability concerning dual eligible beneficiaries, regardless of the Medicare only status of the providers of service;

v. That the Plaintiffs have not demonstrated they meet the necessary criteria for Medicare payment of bad debt claims by virtue of deciding not to enroll as Medicaid providers;

vi. That the states' confirmations of their inability to process the Plaintiffs' bills (due to the fact that the Plaintiffs are not enrolled as providers in the Medicaid program) does not constitute adequate determination from the states that the debts are actually uncollectible when claimed;

vii. That the language in section 322 of the PRM "plainly requires" that the Plaintiffs bill the state as a prerequisite to Medicare reimbursement of bad debt claims;

viii. That the must-bill policy's application to non-Medicaid providers has been "consistently articulated" in final decisions of and applied by the Secretary addressing this issue;

ix. That the must-bill policy as recently interpreted by the CMS is "consistent" with the statute, regulation and PRM;

x. That the Plaintiffs were aware of the Medicare bad debt reasonable collection requirements and chose not to participate in the Medicaid program; and

xi. That the Plaintiffs' decision not to participate in the Medicaid program must necessarily include the decision that they have foreclosed the payment of Medicare bad debts for dual eligible beneficiaries in making that choice.

## PRAYER FOR RELIEF

**128.    WHEREFORE, Plaintiffs pray for judgment against Defendant as follows:**

A.    That the Court set aside the Administrator's final decision, findings, and conclusions in this case as arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law, and/or unsupported by substantial evidence;

B.    That the Court set aside the Administrator's final decision, findings, and conclusions in this case because the Secretary's new interpretation of the must-bill policy which requires non-Medicaid-participating providers – including Plaintiffs –  to bill states for dual eligible cost sharing amounts and obtain RAs prior to submitting those costs for payment by Medicare as bad debt claims, constitutes a new substantive rule for which the Secretary failed to comply with notice and comment rulemaking procedures required by the APA and the Medicare Act;

C.    That the Court direct the Intermediary to pay Plaintiffs for the dual eligible bad debts for the cost reporting periods at issue, which in the aggregate totals $438,693;

D.    That the Court award Plaintiffs prejudgment interest to which they are entitled to as a matter of right under 42 U.S.C. § 1395oo(f)(2);

E.    That the court award Plaintiffs' costs and legal fees; and

F.    That the Court grant to Plaintiffs such other and further relief that the Court deems proper.

Dated: August 12, 2010

Respectfully submitted,

*Jason M. Healy*

Jason M. Healy (D.C. Bar No. 468569)
Andrew C. Bernasconi (D.C. Bar No. 484614)
REED SMITH LLP
1301 K Street NW
Suite 1100 – East Tower
Washington, DC 20005
(202) 414-9200
(202) 414-9299 (fax)
jhealy@reedsmith.com
abernasconi@reedsmith.com