**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SELECT SPECIALTY HOSPITAL-DENVER, INC., *et al.*, | |
| Plaintiffs, | Civil Action No. 10-1356 (BAH) |
| v. | Chief Judge Beryl A. Howell |
| ALEX M. AZAR II, *Secretary, U.S. Department of Health and Human Services*, | |
| Defendant. | |

## <u>MEMORANDUM OPINION</u>

Plaintiffs, seventy-five long-term care hospitals, prevailed in their suit seeking over $20 million in reimbursements from the Centers for Medicare and Medicaid Services ("CMS") for unpaid co-insurance and deductible obligations of patients eligible for both Medicare and Medicaid. *See Select Specialty Hosp.-Denver, Inc. v. Azar*, 391 F. Supp. 3d 53 (D.D.C.), *reconsideration denied*, 2019 WL 5697076 (D.D.C. Nov. 4, 2019). Now, under the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412, plaintiffs seek $1,323,298.04 in attorney's fees and costs incurred during this litigation and the underlying administrative proceedings. *See* Pls.' App. by Mot. for Attys.' Fees & Costs Under EAJA ("Pls.' Mot.") at 1, ECF No. 91; Pls.' Supp. App. by Mot. for Attys.' Fees & Costs Under EAJA ("Pls.' Supp.") at 2, ECF No. 97. Plaintiffs argue that they are entitled to these fees and costs because CMS acted in bad faith before and during the litigation, or, in the alternative, because the position CMS took was not substantially justified. *See* Pls.' Mem. Supp. Pls.' Mot. ("Pls.' Mem.") at 3–4, ECF No. 91. CMS's conduct does not meet the stringent standard for a finding of bad faith. Further, CMS's position was substantially justified at the time it was formulated: *Select Specialty Hospital* ruled

1

for plaintiffs based on *Azar v. Allina Health Services*, 139 S. Ct. 1804 (2019), a Supreme Court decision issued a week after the parties completed briefing on the dispositive motions, *see Select Specialty*, 391 F. Supp. 3d at 66.  Accordingly, and as explained in detail below, plaintiffs' requests for attorney's fees and costs are denied.

## I.   BACKGROUND

The statutory, regulatory, procedural, and factual background were detailed in *Select Specialty Hospital*.  391 F. Supp. 3d at 56–66.  Only pertinent background is repeated here.

### A.   Statutory and Regulatory Background

In the Medicare context, unpaid co-insurance and deductible obligations are known as "bad debts."  *See* 42 C.F.R. § 413.89(b)(1) (defining "bad debts" as "amounts considered to be uncollectible from accounts and notes receivable that were created or acquired in providing services").  Medicare providers may be reimbursed by CMS only for "allowable" bad debts, *id.* § 413.89(d), and a bad debt cannot be "allowable" unless "[t]he provider [is]. . . able to establish that reasonable collection efforts were made," *id.* § 413.89(e) (outlining four criteria that determine whether a debt is allowable).

Patients eligible for both Medicare and Medicaid are known as "dual-eligible patients." For dual-eligible patients' bad debts, providers can satisfy this reasonable collection requirement by showing (1) that the patient has "been determined eligible for Medicaid" and (2) that "no source other than the patient," including Medicaid, "would be legally responsible for the patient's medical bill."  Provider Reimbursement Manual, Part I ("PRM-I") § 312.  The second obligation was at issue here.

To fulfill this obligation, CMS currently requires that all providers "bill the patient or entity legally responsible for the patient's bill."  H-AR at 584 (Joint Signature Memorandum 370

("JSM 370") (Aug. 10, 2004)).[1]  "[W]ith respect to 'dual-eligibles,'" current CMS guidance further states that "in those instances where the state owes none or only a portion of the dual-eligible patient's deductible or co-pay, the unpaid liability for the bad debt is not reimbursable to the provider by Medicare until the provider bills the State, and the State refuses payment (with a State Remittance advice)."  *Id.*

Prior to 2007, though, the plaintiffs had been reimbursed for their dual-eligible patients' bad debts without first billing state Medicaid programs and obtaining a remittance advice, or RA. *See Select Specialty*, 391 F. Supp. 3d at 55, 60–62.  These steps were viewed as unnecessary because states were not liable for inpatient care of dual-eligible patients by long-term care hospitals.  *Id.* at 55.  Indeed, none of the plaintiffs were enrolled in their state Medicaid programs as providers prior to 2007, *id.* at 60, and some states would not allow these types of hospitals to enroll, *id.* at 61.

In 2007, Medicare administrative contractors suddenly began denying plaintiffs' requests for reimbursement for dual-eligible bad debts, citing plaintiffs' failure to present RAs.[2]  In July and August 2007, one set of plaintiffs, the *Select I* plaintiffs, had their reimbursement requests for dual-eligible patients' bad debts in fiscal year 2005, totaling $438,693, denied by their

---

[1]     Four Administrative Records have been filed in this consolidated case.  The AR from the first-filed case, *Select Specialty Hosp.- Denver, Inc. v. Azar* ("*Select I*"), No. 10-cv-1356, is referred to as the *Select I* Administrative Record ("S1-AR").  *See* Joint Appendix ("JA"), Appendix from *Select I* AR (1 of 2), ECF No. 73-1; JA, Appendix from *Select I* AR (2 of 2), ECF No. 73-2.  The first-filed case also includes a Supplemental AR ("S1S-AR") with documents from after the case was remanded to CMS.  *See* JA, Appendix from *Select I* AR Supplement, ECF No. 73-3.  The AR from the second-filed case, *Select Specialty Hosp.-Birmingham v. Azar* ("*Select II*"), No. 17-cv-235, is referred to as the *Select II* Administrative Record ("S2-AR").  *See* JA, Appendix from *Select II* AR (1 of 3), ECF No. 73-4; JA, Appendix from *Select II* AR (2 of 3), ECF No. 73-5; JA from *Select II* AR (3 of 3), ECF No. 73-6.  Finally, the AR from the third-filed case, *Select Specialty Hosp.-Tulsa/Midtown, LLC v. Azar* ("*Hillcrest*"), No. 18-cv-584, is referred to as the *Hillcrest* Administrative Record ("H-AR").  *See* JA, Appendix from *Hillcrest* AR, ECF No. 73-7.

[2]     The Secretary of HHS is required by statute to delegate most of "[t]he administration of [Medicare Part A] . . . through contracts with [M]edicare administrative contractors." 42 U.S.C. § 1395h(a).  These contractors are responsible for "[d]etermining . . . the amount of the payments required . . . to be made to providers of services, suppliers and individuals" and for making those payments.  *Id.* § 1395kk-1(a)(4).

contractor, Wisconsin Physicians Service Corporation ("WPS").  *See Select Specialty*, 391 F.
Supp. 3d at 61 (citing S1-AR at 674).  A second set of plaintiffs, the *Select II* plaintiffs, had
various such requests for fiscal years 2006–2010, totaling $19,317,678, denied by contractors
WPS and Novitas Solutions, Inc., beginning in June 2007.  *Id.* (citing S2-AR at 457 (Stipulations
¶ 9)).  The third plaintiff, the *Hillcrest* plaintiff, had dual-eligible bad debts reimbursement
requests denied for the first time by WPS in December 2008; this plaintiff was ultimately denied
$568,803 in reimbursements for dual-eligible bad debts for fiscal years 2007 and 2008.  *Id.*
(citing H-AR at 555–57, 565–67; H-Answer ¶¶ 6).

The three sets of plaintiffs appealed the contractors' denials to the Provider
Reimbursement Review Board ("PRRB"), which reversed those denials in part.  *See id.* at 64–65
(citing *Select Specialty '05 Medicare Dual Eligible Bad Debts Grp.* v. *Wisc. Physicians Serv.*,
PRRB 2010-D25 (Apr. 13, 2010); *Select Specialty Medicare Dual Eligible Bad Debts CIRP
Grps. v. Novitas Solutions, Inc.*, PRRB 2016-D22 (Sept. 27, 2016); *Hillcrest Specialty Hosp. v.
Novitas Solutions, Inc.*, PRRB 2018-D3 (Nov. 6, 2017)).  The CMS Administrator, whom the
Secretary of Health and Human Services ("HHS") has given authority to hear appeals from the
PRRB, reinstated the contractors' decisions to deny the plaintiffs' dual-eligible bad debt
reimbursements for failure to submit RAs.  *Id.* at 65 (citing S1-AR at 2–19; S2-AR at 1–22; H-
AR at 2–29).

## B.     The Instant Litigation

The first set of plaintiffs, the *Select I* plaintiffs, appealed the Administrator's decision
about their reimbursements to this Court, *see* Complaint, *Select I*, No. 10-cv-1356, ECF No. 1,
which granted partial summary judgment to the plaintiffs and remanded the case to the
Administrator "for reconsideration of the limited issue of whether Plaintiffs were justified in
relying on CMS' prior failure to enforce the must-bill policy with respect to dual-eligible

reimbursement claims from non-participating Medicaid providers," *Cove Assocs. Joint Venture v. Sebelius*, 848 F. Supp. 2d 13, 30 (D.D.C. 2012).  The Administrator affirmed the previous denial of reimbursements to the *Select I* plaintiffs, *see Select Specialty*, 391 F. Supp. 3d at 65–66 (citing S1S-AR at 3–9), and the *Select I* plaintiffs' case in this Court was then reopened and eventually consolidated with the *Select II* and *Hillcrest* plaintiffs' cases, *see* Minute Order (Jan. 10, 2019).

In granting the plaintiffs' motion for summary judgment and denying CMS's cross-motion, *Select Specialty Hospital* held that CMS was required by the Medicare Act, 42 U.S.C. § 1395hh(a)(2), to conduct notice-and-comment rulemaking before subjecting the non-Medicaid participating plaintiffs to the must-bill and RA requirements.  391 F. Supp. 3d at 67.  Section 1395hh(a)(2) requires CMS to give notice and an opportunity to comment when "establish[ing] or chang[ing] a substantive legal standard governing the scope of benefits."  42 U.S.C. § 1395hh(a)(2).  A Supreme Court decision issued just after the parties finished briefing the motions for summary judgment, *see Select Specialty*, 391 F. Supp. 3d at 66, clarified that this provision "distinguish[es] a substantive from a *procedural* legal standard," and requires that CMS conduct notice and comment rulemaking for changes to the former but not to the latter type of standard, *Allina Health Servs.*, 139 S. Ct. at 1811 (emphasis in original).  *Allina* affirmed the D.C. Circuit's judgment in *Allina Health Services v. Price*, 863 F.3d 937 (D.C. Cir. 2017), without endorsing "in every particular," the D.C. Circuit's definition of "substantive," preferring to leave "questions about the statute's meaning" not essential to resolving that case for "other cases," *Allina Health Servs.*, 139 S. Ct. at 1814.  The D.C. Circuit has further defined "substantive legal standard," as, "at a minimum includ[ing] a standard that 'creates, defines, and

regulates the rights, duties, and powers of parties.'"  *Price*, 863 F.3d at 943 (quoting BLACK'S

LAW DICTIONARY (10th ed. 2014)).

The record evidence in this case demonstrated that "CMS's application of the must-bill

and RA requirements to the plaintiffs beginning in 2007 was a change in policy."  *Select*

*Specialty*, 391 F. Supp. 3d at 62.  That change was substantive rather than procedural because

"CMS changed not just the steps that existing LTCHs must take, vis-à-vis CMS, to be

reimbursed, but also changed whether such entities must form contracts with third parties, the

state Medicaid programs."  *Id.* at 69.  Given that the change was substantive, "without satisfying

the notice-and-comment obligation of § 1395hh(a)(2), CMS could not, and indeed cannot,

impose the must-bill policy and RA requirement on the plaintiffs for the period when they were

non-Medicaid-participating providers."  *Id.*  Thus, summary judgment was granted to the

plaintiffs, the Administrator's decisions were set aside, and the case was remanded to HHS for

proceedings consistent with the ruling.  *See* Order (Aug. 22, 2019), ECF No. 74.

After CMS's motion for reconsideration was denied because it relied on "recycled"

arguments rejected in the initial decision, *Select Specialty*, 2019 WL 5697076, at *6., CMS

appealed, Notice of Appeal, ECF No. 88, and eventually withdrew the appeal, *see* Appellant's

Mot. to Voluntarily Dismiss Appeal, *Select Specialty Hospital – Denver, Inc. v. Azar*, No. 20-

5004 (D.C. Cir. Jan. 13, 2020); Order, *Select Specialty Hospital – Denver, Inc.*, No. 20-5004

(D.C. Cir. Jan. 28, 2020).  Plaintiffs then timely filed the instant motion for attorney's fees, and a

supplemental motion.[3]  With the filing, on May 8, 2020, of CMS's opposition to plaintiffs'

---

[3]      Any application for an award of fees and expenses under the EAJA must be filed "within thirty days of
final judgment in the action."  28 U.S.C. § 2412(d)(1)(B).  A "[f]inal judgment" is one "that is final and not
appealable, and includes an order of settlement."  *Id.* § 2412(d)(2)(G).  Interpreting these provisions, courts have
held that an EAJA fee application is timely if filed within 30 days of a appellate order granting the government's
motion to voluntarily dismiss an appeal. *See McDonald v. Schweiker*, 726 F.2d 311, 313–15 (7th Cir. 1983) (holding
this); *Am. Acad. of Pediatrics v. Heckler*, 580 F. Supp. 436, 438 (D.D.C. 1984) (same); *cf. Mass. Union of Pub.
Hous. Tenants v. Pierce*, 755 F.2d 177, 180 (D.C. Cir. 1985) (holding that a judgment is final "only when a

supplemental motion, the plaintiffs' motions for attorney's fees and costs are ripe for resolution. *See* Def.'s Opp'n to Pls.' Supp. Mot., ECF No. 98.[4]

## II.   LEGAL STANDARD

Under the common law "American Rule," "parties are ordinarily required to bear their own attorney's fees," so federal courts "follow 'a general practice of not awarding fees to a prevailing party absent explicit statutory authority.'" *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 602 (2001) (internal citation omitted) (quoting *Key Tronic Corp. v. United States*, 511 U.S. 809, 819 (1994)).  The EAJA authorizes fee awards to parties prevailing against the United States, as described in the following Part, *see infra* Part III.A, "and thus amounts to a partial waiver of sovereign immunity," *Ardestani v. INS*, 502 U.S. 129, 137 (1991).

Based on the recognition that district courts are "better positioned . . . to decide the issue[s] in question," *Pierce v. Underwood*, 487 U.S. 552, 560 (1988) (internal quotation marks omitted), appellate courts engage in "deferential review of a district court's decision regarding attorney's fees under the EAJA," *id.* at 563.  First, the appellate court "ask[s] whether the district court relied on the proper legal standards." *F.J. Vollmer Co. v. Magaw*, 102 F.3d 591, 596 (D.C. Cir. 1996).  "Errors in these and other purely legal determinations necessarily constitute abuses of discretion." *Id.* (citing *Koon v. United States*, 518 U.S. 81, 100 (1996); *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 402 (1990)).  Second, in "examining the district court's

_____

judgment is 'no longer contestable through the appellate process'" (quoting *McDonald*, 726 F.2d at 313)). Plaintiffs' initial application was filed on February 11, 2020, *see* Pls.' Mot., which is just 14 days after the D.C. Circuit's January 28, 2020 dismissal order, *see* Order, *Select Specialty Hospital – Denver, Inc.*, No. 20-5004.  The application is therefore also timely under the more general requirement, found in Federal Rule of Civil Procedure 54(d)(2)(B), that a fee petition must be filed within 14 days "[u]nless otherwise provided by statute or order of the court." FED. R. CIV. P. 54(d)(2)(B).

[4]      The supplemental application requested that "attorneys' fees and expenses that Plaintiffs incurred from the preparation of the original fee application (Dkt. No. 91), the reply brief in response to Defendant's opposition (Dkt. No. 96), and this supplemental motion (Dkt. No. 97)" be included in any award. Pls.' Supp. Mot. at 2.

application of those standards to the facts before it," the appellate court "will reverse the district court if its decision rests on clearly erroneous factual findings or if it leaves . . . 'a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors.'" *Id.* (quoting *De Allende v. Baker*, 891 F.2d 7, 11 n.7 (1st Cir. 1989)).

## III.   DISCUSSION

Plaintiffs argue that they are entitled to attorney's fees and costs under § 2412(b) "based upon Defendant's bad faith conduct prior to and during this litigation." Pls.' Mot. at 1.  In the alternative, they seek an award under § 2412(d) "because Defendant's position was not substantially justified." *Id.*  An overview of the relevant legal rules under § 2412(b) and (d) precedes analysis of plaintiffs' arguments.

### A.   Relevant Rules for Awarding Attorney's Fees and Costs Under the EAJA

At issue here are two means by which a successful litigant may recover attorney's fees and expenses from the government under the EAJA.  First, § 2412(b) provides that "[t]he United States shall be liable for such fees and expenses to the same extent that any other party would be liable under the common law or under the terms of any statute which specifically provides for such an award." 28 U.S.C. § 2412(b).  "A narrow exception" to the American Rule "has developed where the losing party has acted in 'bad faith'" during the litigation or as part of the conduct giving rise to the lawsuit. *Am. Hosp. Ass'n v. Sullivan*, 938 F.2d 216, 219 (D.C. Cir. 1991); *see also, e.g.*, *F.D. Rich Co. v. United States*, 417 U.S. 116, 129 (1974) (noting an exception where the losing party "has acted in bad faith, vexatiously, wantonly, or for oppressive reasons").  "Examples of" bad faith litigation conduct "include the filing of a frivolous complaint or meritless motion, or discovery-related misconduct." *Am. Hosp. Ass'n*, 938 F.2d at 220 (internal citations omitted).  "Bad faith in conduct giving rise to the lawsuit may be found where

8

'a party, confronted with a clear statutory or judicially-imposed duty towards another, is so recalcitrant in performing that duty that the injured party is forced to undertake otherwise unnecessary litigation to vindicate plain legal rights.'" *Id.* (quoting *Fitzgerald v. Hampton*, 545 F. Supp. 53, 57 (D.D.C. 1982)); *see also Am. Employers Ins. Co. v. Am. Sec. Bank*, 747 F.2d 1493, 1502 (D.C. Cir. 1984) (stating that the common law "allows an award of attorneys' fees when the party has been the victim of unwarranted, oppressive, or vexatious conduct on the part of his opponent and has been forced to sue to enforce a plain legal right"). "[T]he substantive standard for a finding of bad faith is 'stringent' and 'attorneys' fees will be awarded only when extraordinary circumstances or dominating reasons of fairness so demand.'" *Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*, 187 F.3d 655, 660 (D.C. Cir. 1999) (per curiam) (quoting *Nepera Chem., Inc. v. Sea–Land Serv., Inc.*, 794 F.2d 688, 702 (D.C. Cir. 1986)). Finally, a "finding of bad faith must be supported by 'clear and convincing evidence,' which 'generally requires the trier of fact, in viewing each party's pile of evidence, to reach a firm conviction of the truth on the evidence about which he or she is certain.'" *Id.* (first quoting *Shepherd v. Am. Broadcasting Cos., Inc.*, 62 F.3d 1469, 1476–78 (D.C. Cir. 1995), and then quoting *United States v. Montague*, 40 F.3d 1251, 1255 (D.C. Cir. 1994)). No statutory cap is applied to the hourly rate used to calculate attorney's fees under § 2412(b). *See* 28 U.S.C. § 2412(b); *see also Am. Hosp. Ass'n*, 938 F.2d at 219 (contrasting § 2412(b) and (d)).

Second, § 2412(d) provides for a mandatory award to the prevailing party "unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust." 28 U.S.C. § 2412(d)(1)(A). To prevail on a claim for fees and costs under § 2412(d), a party must meet five requirements: (1) the party must be a "prevailing party," *see Astrue v. Ratliff*, 560 U.S. 586, 591 (2010) ("[T]he term 'prevailing party'

in subsection (d)(1)(A) carries its usual and settled meaning — prevailing litigant."); (2) the government's position cannot be substantially justified; (3) no special circumstances exist that would make an award unjust; (4) the litigant must meet certain net worth and size requirements; and (5) the fees and costs sought must be reasonable. *See* 28 U.S.C. § 2412(d)(1)(A) & (B).

"Substantially justified" "mean[s] 'justified to a degree that could satisfy a reasonable person' or otherwise having 'a reasonable basis both in law and fact.'" *Taucher v. Brown-Hruska*, 396 F.3d 1168, 1173 (D.C. Cir. 2005) (quoting *Pierce*, 487 U.S. at 565)). In this context, "substantially justified" does not mean "justified to a high degree," *Pierce*, 487 U.S. at 565, or even "more than mere reasonableness," *id.* at 568. At the same time, to be "substantially justified," the government's position must be "more than merely undeserving of sanctions for frivolousness," as "that is assuredly not the standard for Government litigation of which a reasonable person would approve." *Id.* at 566.

"The Government has the burden of proving that its position, including both the underlying agency action and the arguments defending that action in court, was 'substantially justified' within the meaning of the Act." *Halverson v. Slater*, 206 F.3d 1205, 1208 (D.C. Cir. 2000). Although the statutory phrase "position of the United States," 28 U.S.C. § 2412(d)(1)(A), "may encompass both the agency's prelitigation conduct and the Department of Justice's subsequent litigation positions, . . . only one threshold determination for the entire civil action is to be made." *INS v. Jean*, 496 U.S. 154, 159 (1990).

"The mere fact that the government lost in the underlying litigation does not create a presumption that its position was not substantially justified." *Taucher*, 396 F.3d at 1173 (quoting *De Allende*, 891 F.2d at 12). In other words, the EAJA calls for an evaluation distinct from evaluation of the merits. *See id.* ("Although the strength of the government's position in

the litigation obviously plays an important role in a substantial justification evaluation, the reasonableness inquiry 'may not be collapsed into [an] antecedent evaluation of the merits, for EAJA sets out a distinct legal standard.'" (quoting *Cooper v. U.S. R.R. Ret. Bd.*, 24 F.3d 1414, 1416 (D.C. Cir. 1994)).  Methodologically, then, and critical here:  district courts evaluating substantial justification must "do more than explain, repeat, characterize, and describe the merits . . . decision." *Halverson*, 206 F.3d at 1209.  Instead, district courts "must . . . analyze *why* the government's position failed in court:  if, for example, the government lost because it vainly pressed a position 'flatly at odds with the controlling case law,' that is one thing; quite another if the government lost because an unsettled question was resolved unfavorably." *Taucher*, 396 F.3d at 1174 (emphasis in original) (quoting *Am. Wrecking Corp. v. Sec. of Labor*, 364 F.3d 321, 326–27 (D.C. Cir. 2004), and then citing *United States v. Hallmark Constr. Co.*, 200 F.3d 1076, 1080 (7th Cir. 2000)); *see also, e.g.*, *Trahan v. Brady*, 907 F.2d 1215, 1219 (D.C. Cir. 1990) (instructing courts to "analyze[] the government's position looking prospectively from the time the government took this position, without the advantage of this Court's subsequent pronouncement on the actual meaning of the law.").

### B.    Plaintiffs Have Not Shown That CMS Acted in Bad Faith

Plaintiffs argue that CMS acted in bad faith both before and during the litigation.  Before the litigation, plaintiffs claim, CMS "engaged in conduct that required plaintiffs to undertake otherwise unnecessary litigation to vindicate plain legal rights," Pls.' Mem. at 10 (quoting *Gray Panthers Project Fund v. Thompson*, 304 F. Supp. 2d 36, 39 (D.D.C. 2004)), and was otherwise "obstinate, obdurate, and dilatory" in "creating a 'bureaucratic nightmare' for Plaintiffs over a twelve-year period," before the litigation, *id.* at 15 (quoting *Select Specialty*, 391 F. Supp. 3d at 70).  During the litigation, plaintiffs claim, CMS (1) manufactured delays; (2) made misrepresentations to the Court; (3) filed a meritless motion for reconsideration; and

11

(4) attempted improperly to relitigate settled issues. *Id.* at 17. Plaintiffs' assertions of bad faith

lack support in the case law and the record.

### 1. *CMS's Conduct Prior to the Litigation*

Plaintiffs offer two theories in support of their contention that CMS acted in bad faith

before the litigation: that CMS "engaged in conduct that required plaintiffs to undertake

otherwise unnecessary litigation to vindicate plain legal rights," *id.* at 10 (quoting *Gray*

*Panthers*, 304 F. Supp. 2d at 39), and was otherwise "obstinate, obdurate, and dilatory" in the

decade before the litigation, *id.* at 15. Both theories construe the bad faith exception too broadly.

Starting with the first, in *Gray Panthers*, the Secretary of HHS, "ignored," *id.* at 10, two

"unambiguous statutory mandates" — a deadline and a requirement to mail Medicare plan

information to eligible beneficiaries, *Gray Panthers*, 304 F. Supp. 2d at 39. "[B]y clear and

convincing evidence," *Gray Panthers* found that "the Secretary's actions were in bad faith,"

explaining: "while aware of the unambiguous statutory mandates . . ., the Secretary nevertheless

engaged in conduct that required plaintiffs to undertake otherwise unnecessary litigation to

vindicate plain legal rights." *Id.* (citing *Am. Hosp. Ass'n*, 938 F.2d at 220). Thus, *Gray Panthers*

holds that a "court can find pre-litigation bad faith 'where a party, confronted with a clear

statutory . . . duty . . ., is so recalcitrant in performing that duty that the injured party is forced to

undertake otherwise unnecessary litigation to vindicate plain legal rights.'" *Id.* (quoting *Am.*

*Hosp. Ass'n*, 938 F.2d at 220). That rule has no application here. The directive CMS violated —

to engage in notice-and-comment rulemaking before "establish[ing] or chang[ing] a substantive

legal standard," 42 U.S.C. § 1395hh(a)(2) — is not ministerial like the mandates violated in

*Gray Panthers*. Indeed, at least until 2019, the scope of § 1395hh(a)(2)'s mandate was unsettled.

In 2007, when CMS began subjecting plaintiffs to the must-bill policy and the RA requirement,

some courts had interpreted "substantive legal standard" to "incorporate[] the [Administrative Procedure Act, 5 U.S.C. § 551, *et seq.*, (APA)] exemption for interpretive rules," *Warder v. Shalala*, 149 F.3d 73, 79 (1st Cir. 1998), while others had left § 1395hh(a)(2)'s precise "scope" open, *see Monmouth Med. Ctr. v. Thompson*, 257 F.3d 807, 814 (D.C. Cir. 2001) (declining to "decide whether the Medicare Act . . . creates a more stringent" notice-and-comment "obligation" or adopts a different meaning of "substantive" than the APA).  Even after the Supreme Court defined "substantive legal standard" in *Allina*, the key question in this case — whether the must-bill policy and RA requirement were such standards — remained contested.

   In short, this case is not like *Gray Panthers* because CMS's duty to go through notice-and-comment rulemaking was not sufficiently "clear," "unambiguous," or "plain."  304 F. Supp. 2d at 39; *see Am. Employers Ins. Co.*, 747 F.2d at 1502 (spotting no "plain legal right" for purposes of a bad faith finding where deciding the claim "required . . . interpretation" of contracts and "the law on the issue . . . was not settled");  *cf. GasPlus, L.L.C. v. Dep't of Interior*, 593 F. Supp. 2d 80, 88 (D.D.C. 2009) ("The fact that [the contested statutory provision] had only recently been adopted; that no precedent existed to guide [the agencies]; . . . sap the record of clear and convincing evidence that the government acted in bad faith.").[5]  *Gray Panthers*' rule must be so limited.  Otherwise, as CMS puts it, "every time the Government advances a statutory interpretation that a Court ultimately rejects, it is acting in bad faith."  Def.'s Opp'n to Pls.' App. by Mot. for Attys.' Fees & Costs Under EAJA ("Def.'s Opp'n") at 8, ECF No. 95.[6]

---

[5]   Each item on plaintiffs' laundry list of "additional statutory mandates" allegedly violated by defendants suffers from the same flaw.  Pls.' Mem. at 14–15 (arguing that defendants acted in bad faith because they violated, *inter alia*, "the statutory prohibition on cost-shifting," "the bad debt moratorium," and the APA's "arbitrary and capricious standard").

[6]   The circumstances in *Gray Panthers* that plaintiffs emphasize in their reply, *see* Pls.' Reply Supp. App. by Mot. for Attys.' Fees & Costs Under EAJA ("Pls.' Reply") at 3, ECF No. 96, were not determinative there, so any parallel circumstances here do not compel a finding of bad faith, *see Gray Panthers*, 304 F. Supp. 2d at 40 (stating that this "other evidence lends support" to the finding of bad faith).  Similarly, plaintiffs' exhaustive discussion of

Turning to plaintiffs' second theory, plaintiffs argue that CMS acted in bad faith in subjecting them to the must-bill policy and the RA requirement.  *See* Pls.' Mem. at 15–16 (observing that CMS "began 'requiring a certain type of paperwork that the plaintiffs simply could not provide without sufficient advanced notice'" and "*obstinately* continu[ed] to deny reimbursement claims rather than working to find a reasonable solution in conjunction with the state Medicaid programs" (alteration and emphasis in original) (quoting *Select Specialty*, 391 F. Supp. 3d at 70)).  This is the conduct on which plaintiffs based their "substantive claim," *Shimman v. Int'l Union of Operating Engineers*, 744 F.2d 1226, 1231 (6th Cir. 1984), but "the bad faith exception to the American Rule does not allow an award of attorney fees based only on bad faith in the conduct giving rise to the underlying claim," *id.* at 1233; *see also Centex Corp. v. United States*, 486 F.3d 1369, 1372 (Fed. Cir. 2007) ("[W]e align ourselves with eight other circuits that have taken the position that fee awards cannot be assessed based on claims of bad faith primary conduct."); *Ass'n of Flight Attendants v. Horizon Air Indus., Inc.*, 976 F.2d 541, 550 (9th Cir. 1992) ("[N]o federal appellate authority in or out of the Ninth Circuit has clearly approved an order shifting attorney's fees based solely upon a finding of bad faith as an element of the cause of action presented in the underlying suit."); *Centex Corp.*, 486 F.3d at 1372–73 (showing that the D.C. Circuit has not explicitly barred such awards but explaining that neither *American Hospital* nor *Nepera* takes the position that fees may be awarded based on the conduct underlying the substantive claim).  That is because "[f]ees awarded under the bad faith exception . . . are designed to punish the abuse of the judicial process rather than the original wrong." *Shimman*, 744 F.2d at 1232 n.9; *see also Shepherd*, 62 F.3d at 1477 ("[A]wards of attorneys' fees for bad faith conduct serve the same punitive and compensatory purposes as fines imposed

their attempts "to find a solution that would avoid litigation" is beside the point, where the point is that CMS did not violate a clear legal duty.  *See* Pls.' Mem. at 11–13.

for civil contempt.").  Consistent with this design, the cases plaintiffs cite stating that awards can

be based on bad faith in "an aspect of the conduct giving rise to the lawsuit," Pls.' Mem. at 4

(quoting *Am. Hosp. Ass'n*, 938 F.2d at 219); *see also id.* at 15 ("The bad faith exception to the

American Rule 'encompasses obstinacy, obduracy and dilatoriness and which extends to conduct

in initiating . . . the litigation.'" (quoting *In re Nat'l Student Mktg. Litig.*, 78 F.R.D. 726, 728

(D.D.C. 1978)), are all about conduct implicating the judicial process.  For example, *American*

*Hospital*, like *Gray Panthers*, involved agency action that "forced . . . su[it] to enforce . . . plain

legal rights."  *Am. Hosp. Ass'n*, 938 F.2d at 220; *see also In re National Student Marketing*

*Litigation*, 78 F.R.D. at 728 (lacking any consideration of pre-litigation conduct).  The Court

appreciates that CMS's pre-litigation conduct "created a bureaucratic nightmare" for plaintiffs.

*Select Specialty*, 391 F. Supp. 3d at 70.  Nonetheless, an award of attorneys' fees is not an

appropriate means of compensation for pre-litigation injury because "[a] person who harms

another in bad faith is nonetheless entitled to defend a lawsuit in good faith."  *Shimman*, 744

F.2d at 1232 (noting that the "rationale behind the American Rule remains intact when there is

bad faith in the event underlying the substantive claim.").

## 2. *CMS's Litigation Conduct*

Plaintiffs claim that during the litigation CMS (1) caused years-long delays; (2) made

misrepresentations to the Court; (3) filed a meritless motion for reconsideration; and

(4) attempted improperly to relitigate settled issues.  Pls.' Mem. at 17.  The record in this case,

however, does not present the sort of "extraordinary circumstances or dominating reasons of

fairness" that would compel a finding of bad faith during the litigation.  *Ass'n of Am. Physicians*

*& Surgeons*, 187 F.3d at 660 (quoting *Nepera Chem.*, 794 F.2d at 702).

### a. *Delays*

First, plaintiffs claim that defendants displayed bad faith in "'delaying . . . the litigation'

. . . for over five years" through the lengthy remand proceeding and post-remand settlement

negotiations. Pls.' Mem. at 17 (quoting *Hutto v. Finney*, 437 U.S. 678, 690 n.14 (1978)). "CMS

did not take any action on remand for nearly four years," plaintiffs point out. *Id.* at 18 (citing

S1S-AR at 2–10). Given that the PRRB considers over 10,000 claims a year, *see* Def.'s Opp'n at

8 (citing *High Country Home Health v. Thompson*, 359 F.3d 1307, 1310 (10th Cir. 2004)), the

delay on remand more likely reflects an overburdened agency than a stonewalling one. Plaintiffs

have presented no affirmative evidence of bad faith to counter this reasonable inference.[7]

After the remand, the case returned to this Court but was stayed while the parties

negotiated a potential settlement. These negotiations ultimately failed when the HHS Office of

General Counsel ("OGC") declined to approve the parties' agreed-to settlement terms. *See* Pls.'

Opp'n at 18–22. Before this OGC decision, CMS's counsel made representations — to

plaintiffs' counsel and to the Court in joint status reports — about the status of the settlement

approval processes within CMS, HHS, and DOJ. *See id.* (summarizing a jumble of emails, joint

status reports, and other statements made in 2017 and 2018). Plaintiffs think that these

representations overstated the extent to which approval had been obtained and understated the

difficulty of getting remaining approvals, *see, e.g.*, *id.* at 20 (interpreting one joint status report to

"falsely convey[] both significant progress on settlement approval and only one remaining

government office (DOJ) to grant approval"), as a way to buy time to "renegotiate the terms of

---

[7] Plaintiffs' claim that the final agency decision on remand "was not sent to Plaintiffs' counsel of record," Pls.' Mem. at 18 (citing S1-AR at 2, 9-10), is not clear or persuasive evidence of bad faith. CMS indicates that the mailing mix-up may have been plaintiffs' fault. *See* Def.'s Opp'n at 9 n.3 (stating that plaintiffs' "counsel of record was still the law firm of Reed Smith at the time of that decision, which Plaintiffs' current counsel had recently departed and of which he apparently failed to notify CMS. The final agency decision was, therefore, appropriately furnished to Reed Smith." (citation omitted)).

the parties' settlement," *id.* at 22.  Yet, after review of these statements, the Court finds that, over

and over again, agency counsel simply represented what both parties agree is the truth: that CMS

had approved the settlement but that additional approvals were needed.  Plaintiffs thus present no

affirmative evidence that CMS engaged in settlement discussions in bad faith.  *See D.C. v.*

*Straus*, 705 F. Supp. 2d 14, 16–17 (D.D.C. 2010) ("That a party in litigation chooses to seek a

decision on the merits as opposed to settle the case does not alone establish bad faith or

necessarily reflect an illegitimate litigation strategy.").

In the absence of evidence that CMS delayed the litigation in bad faith, plaintiffs' award

of prejudgment interest is compensation enough for the regrettable length of the litigation.  *See*

*Select Specialty*, 2019 WL 5697076, at *7 (awarding prejudgment interest under 42 U.S.C.

§ 1395oo(f)(2)).

### b.  Misrepresentations

Second, plaintiffs argue that CMS made misrepresentations to the Court.  Although

misrepresentations can be the basis for a finding of bad faith, *see, e.g.*, *Swedish Hosp. Corp. v.*

*Shalala,* 845 F. Supp. 894, 898 (D.D.C. 1993) (citing *Lipsig v. Nat'l Student Mktg Corp.*, 663

F.2d 178, 181 (D.C. Cir. 1980)), the record does not support a finding that CMS made any such

misrepresentations.  As already discussed, CMS's statements about the status of approval of the

parties' settlement were not falsehoods.  At worst, counsel was overly optimistic about getting

the remaining approvals when stating a "belie[f] in good faith" that approvals from OGC and

DOJ "will occur."  Pls.' Mem. at 20 (quoting Joint Status Report (Aug. 1, 2018) at 2, ECF 60).

Any expressions of excessive optimism are not enough for a finding of bad faith.  *Cf. Swedish*

*Hosp. Corp.,* 845 F. Supp. at 898 ("A finding of recklessness during litigation, standing alone, is

apparently insufficient to trigger the court's inherent common-law power to award bad faith

attorney's fees.").

Next, plaintiffs claim that CMS misrepresented a background fact — namely "that Plaintiffs did not submit actual Medicaid bills to the states to try to obtain RAs."  Pls.' Mem. at 23 (citing Def.'s Mem. Supp. Cross-Mot. Summ. J. & Opp'n Pls.' Mot. Summ. J., ECF No. 50-1; Def.'s Mem. Supp. Cross-Mot. Summ. J. & Opp'n Pls.' Mot. Summ. J. ("Def.'s SJ Mem."), ECF No. 67-1).  In fact, as *Select Specialty Hospital* explained in a footnote, a "misstatement" by plaintiffs' prior counsel led "to the erroneous conclusion that 'the providers submitted "sample" bills with fabricated claim numbers.'"  391 F. Supp. 3d at 63 n.9 (quoting *Cove Assocs.*, 848 F. Supp. 2d at 28).  Plaintiffs' counsel "subsequently clarified" the misstatement, but CMS repeated the erroneous conclusion in briefing the cross-motions for summary judgment.  *Id.*  CMS now admits to "incorrectly . . . stat[ing] that Plaintiffs had submitted sample bills to the States" but characterizes the statement as an "oversight."  Def.'s Opp'n at 11.  Plaintiffs offer zero evidence rebutting this characterization.  *See Ass'n of Am. Physicians & Surgeons*, 187 F.3d at 662–63 ("[B]ecause there is insufficient evidence that . . . the Declaration's drafters intended to mislead the court, it was clearly erroneous for the court to find bad faith."); *Swedish Hosp. Corp.*, 845 F. Supp. at 899 ("[P]laintiffs have not proven that the omission was due to other than incompetence or inadvertence.").[8]

---

[8]    Finally, plaintiffs attempt to paint as misrepresentations two legal arguments made by CMS.  Plaintiffs complain that (1) "[d]efendant's summary judgment briefs also misrepresented that Plaintiffs' only recourse was with the state Medicaid programs, not CMS," Pls.' Mem. at 23, and (2) "[d]efendant also misrepresented to the Court that state Medicaid programs would have 'constructively' enrolled Plaintiffs in Medicaid if only Plaintiffs had submitted claims to the states," *id.* at 24.  CMS did indeed argue (1) that plaintiffs were "not without legal recourse" against the states that had refused to issue RAs, pointing to a successful suit by providers "against the state [of Florida] for refusing enrollment," Def.'s SJ Mem. at 27, and (2) that "CMS has unambiguously directed State Medicaid programs that they are required to permit the provider to enroll for the limited purpose of obtaining" RAs, pointing to a guidance issued by CMS in 2013, *id.* (internal quotation marks omitted); *see also id.* at 24 n.8 (providing a link to the guidance).  These arguments by CMS did not win the day, but the arguments were not false, groundless, or otherwise made in bad faith.

### c. Motion for Reconsideration

Plaintiffs' third argument — that CMS demonstrated bad faith in "filing a meritless motion" for reconsideration, Pls.' Mem. at 26 — is easily dispatched.  "A party is not to be penalized for maintaining an aggressive litigation posture, nor are good faith assertions of colorable claims or defenses to be discouraged," *Lipsig*, 663 F.2d at 180, so only motions that are "frivolous, unreasonable, or without foundation" can support a finding of bad faith, *Washington Hosp. Ctr. v. Serv. Employees Int'l Union Local 722, AFL-CIO*, 746 F.2d 1503, 1510 (D.C. Cir. 1984) (quoting *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 421 (1978)); *see also Lipsig*, 663 F.2d at 180 ("[A]dvocacy simply for the sake of burdening an opponent with unnecessary expenditures of time and effort clearly warrants recompense for the extra outlays attributable thereto."); 10 CHARLES WRIGHT & ARTHUR MILLER, FEDERAL PRACTICE & PROCEDURE § 2675 (4th ed., 2020 update) ("[C]ourts are careful not to discourage parties from litigating thoroughly and bad faith will not be found if the party's actions were deemed nonfrivolous or only ordinarily negligent.").  CMS's motion for reconsideration was none of those things.  The motion was denied because it relied on "recycled" arguments rejected in the initial decision.  *Select Specialty*, 2019 WL 5697076, at *6.  These arguments — that *Select Specialty Hospital* conflicted with earlier rulings calling the must-bill policy longstanding and that failure to apply the policies was attributable to the contractors and not to CMS, *id.* at *4 — were unpersuasive but not frivolous, as the in-depth treatment of those arguments in the motion for reconsideration and original decision illustrates, *see id.* at *4–6 (citing to discussions from *Select Specialty Hospital*); *see also Centex Corp.*, 486 F. 3d at 1375 (affirming finding of lack of bad faith where arguments were not frivolous).  In addition, the filing of a motion for reconsideration that recycles arguments does not in itself show bad faith, as motions for reconsideration often "rel[y] on the same arguments . . . originally made."  *Messina v. Krakower*,

439 F.3d 755, 759 (D.C. Cir. 2006) (first alteration in original) (internal quotation marks omitted).

### d. Relitigating Settled Issues

Finally, plaintiffs argue that "[d]efendant has engaged in bad faith through its efforts to force Plaintiffs to relitigate the issue in this case." Pls.' Mem. at 27. Even if such conduct could support a finding of bad faith, no clear and convincing evidence has been presented that CMS has done what plaintiffs say. Plaintiffs point to CMS's refusal to settle "Plaintiffs' and other Select Medical LTCHs' appeal for FY 2011," Pls.' Mem. at 27 (citing Complaint, *Select Specialty Hosp., Inc. v. Azar*, No. 19-cv-2591 (BAH) (filed Aug. 27, 2019), ECF No. 1), but the recent grant of CMS's motion to dismiss that case for lack of subject matter jurisdiction shows that CMS had good reason to litigate rather than settle that case, *Select Specialty Hosps., Inc. v. Azar*, No. 19-cv-2591 (BAH), 2020 WL 2735616, at *7 (D.D.C. May 26, 2020). There, plaintiffs filed suit in federal court to challenge a PRRB decision that the Administrator later timely vacated and remanded to the PRRB "to 'further develop[ ] . . . the record' on . . . issues, including 'the enrollment status of LTCHs in States where the Providers claim they were not allowed to enroll.'" *Id.* (quoting CMS Decision at 28). As that case demonstrates, claims like plaintiffs' can be fact-dependent, so CMS's choice to litigate rather than settle future claims appears legitimate, not obstinate, on the current record.

*     *     *

In sum, plaintiffs have not shown that CMS acted in bad faith before or during this litigation. Plaintiffs' request for fees and expenses on the basis of bad faith is therefore denied.

### C.    CMS's Position Was Substantially Justified

Plaintiffs contend that they are "still entitled to a mandatory award of attorneys fees under 28 U.S.C. § 2412(d)," even if no bad faith is found. Pls.' Mem. at 28. Recall that, to

20

prevail on a claim for fees and costs under § 2412(d), a party must meet five requirements: (1) the party must be a prevailing party; (2) the government's position cannot be substantially justified; (3) no special circumstances exist that would make an award unjust; (4) the litigant must meet certain net worth and size requirements; and (5) the fees and costs sought must be reasonable. *See* 28 U.S.C. § 2412(d)(1)(A) & (B).  Plaintiffs indisputably are a "prevailing party," *see* Pls.' Mem. at 7–9; Def.'s Opp'n at 11 (not contesting this element); *cf. Select Specialty*, 2019 WL 5697076, at *7 (deeming plaintiffs a prevailing party under 42 U.S.C. § 1395oo(f)(2)), but CMS has shown that its position was substantially justified.  As a result, CMS's argument that plaintiffs "do not satisfy the statutory size and income limits prescribed by 28 U.S.C. § 2412(d)," Def.'s Opp'n at 11, need not be evaluated, *see Taucher*, 396 F.3d at 1173 ("Once an applicant's status as a prevailing party is established, the government has the burden of showing that its legal position was substantially justified or that special circumstances make an award unjust." (citation omitted)).

   CMS took the position that application of the must-bill policy and RA requirement to plaintiffs was lawful.  In defense of that position, CMS points to numerous prior cases upholding the must-bill policy and RA requirement against statutory and arbitrary and capricious challenges.  *See* Def.'s Opp'n at 4, 6; *see also* Def.'s SJ Mem. at 22–24.  In upholding the policies, these prior cases characterized the must-bill requirement as "longstanding," *see* Def.'s Opp'n at 4, 6 (citing cases), a characterization CMS embraced throughout this litigation as evidence that the policies had not actually changed, Def.'s SJ Mem. at 28.  The view that the policy was longstanding, along with "the novelty of the *Allina* issue that formed the basis of the Court's ruling," justified its position, CMS argues.  *See* Def.'s Opp'n at 4–6.

Plaintiffs argue that application of the must-bill policy and RA requirement was "not reasonable in law because CMS violated the statute at 42 U.S.C. § 1395hh(a)(2)," Pls.' Mem. at 30, but that formulation collapses the substantial justification inquiry into the merits. What matters now is not the legality of CMS's decision to bypass notice-and-comment rulemaking but whether that decision was substantially justified at the time. *See Trahan*, 907 F.2d at 1219 (instructing courts to "analyze[] the government's position looking prospectively from the time the government took this position, without the advantage of this Court's subsequent pronouncement on the actual meaning of the law."). That decision was substantially justified.

As already explained, until *Allina*, in 2019, some courts read the phrase "substantive legal standard" to contemplate an interpretive rule exception to the Medicare Act's notice-and-comment requirement. *See, e.g.*, *Warder*, 149 F.3d at 79; *Monmouth Med. Ctr.*, 257 F.3d at 814 (assuming this without deciding). Consistent with this reading of § 1395hh(a)(2), CMS bypassed notice-and-comment because it viewed any change in application of the must-bill policy and RA requirement as interpretive. *See* Def.'s SJ Mem. at 36 (citing *Cove Assoc.*, 848 F. Supp. 2d at 27–28). A court in 2012 determined that the must-bill policy and RA requirement were clearly "interpretive" because they met "*[n]one of the[] conditions*" of a legislative rule. *Cove Assoc.*, 848 F. Supp. 2d at 27 (emphasis added). CMS's position that changes to the policies were interpretive and that interpretive rules were exempt from notice-and-comment rulemaking thus "had a reasonable basis" in case law, *Pierce*, 487 U.S. at 563, and that is sufficient to justify it "to a degree that could satisfy a reasonable person" *id.* at 564; *see also Hill v. Gould*, 555 F.3d 1003, 1007 (D.C. Cir. 2009) (affirming finding of substantial justification because position "was not flatly at odds with the controlling case law, and the Secretary certainly did not press her position in the face of an unbroken line of authority, or against a string of losses" (internal

quotation marks and citations omitted)); *see also, e.g.*, *Ivy Sports Med., LLC v. Burwell*, 174 F. Supp. 3d 130, 146 (D.D.C. 2016) ("Although the government was incorrect is anticipating [the development of the case law], the Court finds that the government's position, as applied to the facts of this case and considering the case law at the time, was substantially justified."); *Ctr. for Food Safety v. Burwell*, 126 F. Supp. 3d 114, 126 (D.D.C. 2015) ("The Defendants' litigation position was substantially justified because it cited authority that is 'justified to a degree that could satisfy a reasonable person.'" (quoting *Pierce*, 487 U.S. at 565)).

By the time CMS was defending its position at the summary judgment stage of this case, the D.C. Circuit had shifted its definition of "substantive legal change" and that redefinition was on review in the Supreme Court. *See* Def.'s SJ Mem. at 37 (discussing *Price*, 863 F.3d at 943–44 (D.C. Cir. 2017)). Here, CMS, relying on the Solicitor General's briefing in *Allina*, maintained that interpretive rules were not subject to the Medicare Act's notice-and-comment requirement. *See* Def.'s SJ Mem. at 37 (discussing *Allina Health Servs. v. Price*, 863 F.3d at 943–44). These developments in no way undermine the conclusion that CMS's position was substantially justified. If anything, that the Supreme Court granted certiorari to settle a dispute about the meaning of § 1395hh(a)(2) bolsters the conclusion that CMS's position, developed as it was amid legal uncertainty in a complex area of law, was reasonable. *See Lundin v. Mecham*, 980 F.2d 1450, 1460 (D.C. Cir. 1992) ("Given the unsettled state of the law at that time, the Director's initial position cannot be deemed unreasonable."); *Hill*, 555 F.3d at 1008 ("[T]he Secretary took a reasonable approach to that relatively unsettled area of administrative law.").

To plaintiffs, the government's voluntary dismissal of its appeal signals "that there was not a reasonable basis in law for Defendant's position." Pls.' Mem. at 30. "While . . . objective indicia," "such as the terms of a settlement agreement" or "the stage in the proceedings at which

the merits were decided," can "be relevant" to the substantial justification inquiry, such indicia can also be misleading.  *Pierce*, 487 U.S. at 568.  For example, "willingness to settle the litigation on unfavorable terms" could be a sign that the government's position was groundless or could reflect, say, "a change in substantive policy instituted by a new administration."  *Id.*  Factors other than the strength of CMS's position could easily explain the decision to withdraw the appeal.  Given that *Select Specialty Hospital* was the first decision to apply *Allina*, the government might have seen benefits in allowing further development of the law before putting this issue before the D.C. Circuit.  Or, as a matter of strategy, CMS might have preferred for a circuit court to decide an issue of this consequence in a case that CMS won in a district court.  In short, the withdraw of the appeal is not in this case a conclusive "sign that the government's case is weak."  Pls.' Mem. at 30.

Finally, plaintiffs contend that applying the must-bill policy to them when they could not enroll in state Medicaid programs was "not reasonable in fact," Pls.' Mem. at 30, but that argument is premised on a distortion of the standard, which requires CMS to show not that its actions were, in fact, reasonable but that its position had "a reasonable basis in fact."  *See, e.g.*, *Taucher*, 396 F.3d at 1173 (defining substantially justified as "'justified to a degree that could satisfy a reasonable person' or otherwise having 'a reasonable basis both in law and fact'" (quoting *Pierce*, 487 U.S. at 565)); *Hill*, 555 F.3d at 1007 ("It is enough that the Secretary's interpretation and legal arguments had a reasonable basis in fact and in the text and purpose of the controlling statute and treaties.").

One factual aspect of CMS's position was ultimately unsupported by the record: CMS insisted throughout the litigation that the policies were longstanding and that any change in how the plaintiffs were reimbursed should be attributed to the contractors.  In defense of its view,

CMS cited case law indicating that the policy was longstanding, *see* Def.'s Opp'n at 4 (citing, *inter alia*, *Maine Med. Ctr. v. Burwell*, 775 F.3d 470, 473 (1st Cir. 2015)), and presented a plausible, though ultimately rebutted, narrative faulting the contractors for any deviation from that policy, *see Select Specialty*, 2019 WL 5697076, at *5–6 (summarizing this evidence). In addition, CMS's view of the policy's history was consistently accompanied by the alternative argument already discussed: if the policy did change, CMS argued, then that change was justified. Taken together, those arguments get CMS over the reasonable basis in fact threshold.

*        *        *

In sum, CMS has shown that its position had a reasonable basis in fact and law. Plaintiffs are not entitled to a fee award under § 2412(d).

## IV.    CONCLUSION

Plaintiffs have not shown by clear and convincing evidence that CMS acted in bad faith before or during this litigation. For that reason, plaintiffs' request for fees and expenses under § 2412(b) is denied. In addition, CMS has shown that its position was substantially justified. As a result, plaintiffs are not entitled to an award of fees and expenses under § 2412(d). Plaintiffs' motion and supplemental motion for attorney's fees and costs are denied.

An appropriate Order accompanies this Memorandum Opinion.

Date: June 25, 2020

_____
BERYL A. HOWELL
Chief Judge