## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SELECT SPECIALTY HOSPITAL-
DENVER, INC., *et al.*,

              Plaintiffs,

              v.

XAVIER BECERRA,[1] *Secretary*, *U.S. Department of Health and Human Services*,

              Defendant.

Civil Action No. 10-1356 (BAH)

Chief Judge Beryl A. Howell

## <u>MEMORANDUM OPINION</u>

In August 2019, this Court granted summary judgment in favor of plaintiffs—seventy-five long-term care hospitals ("LTCHs") located in 26 states—on their claims for reimbursement from the Department of Health and Human Services ("HHS") for unpaid co-insurance and deductible obligations ("bad debts") of patients eligible for both Medicare and Medicaid. *See Select Specialty Hosp.-Denver, Inc. v. Azar* ("*Select Specialty I*"), 391 F. Supp. 3d 53, 55 (D.D.C. 2019). Contravening the notice-and-comment rulemaking required by the Medicare Act, 42 U.S.C. § 1395hh(a)(2), in 2007, the Centers for Medicare and Medicaid Services ("CMS") abruptly began to refuse reimbursement of bad debts under the must-bill policy and concomitant remittance advice ("RA") requirement, which directed plaintiffs first to seek reimbursement from their state Medicaid programs prior to billing Medicare. *Id.* This Court ordered the CMS Administrator to "promptly . . . reconsider," on remand, "whether, absent the must-bill and RA requirements, the plaintiffs are entitled to bad debt reimbursement." *Id.* at 70.

---

[1]     Pursuant to Federal Rule of Civil Procedure 25(d), plaintiffs automatically substitute Xavier Becerra, successor to formerly listed Alex M. Azar II, as the defendant in this action.

Plaintiffs were also entitled to prejudgment interest pursuant to 42 U.S.C. § 1395oo(f)(2). *Select Specialty Hosp.-Denver, Inc. v. Azar* ("*Select Specialty II*"), 2019 WL 5697076, at *6–7 (D.D.C. Nov. 4, 2019). HHS unsuccessfully sought reconsideration of this Court's decision, *see id.*, and then filed an appeal to the D.C. Circuit, which the agency subsequently voluntarily dismissed, *see Select Specialty Hosp.-Denver, Inc. v. Azar*, 391 F. Supp. 3d 53 (D.D.C. 2019), *appeal dismissed* No. 20-5004 (D.C. Cir. Jan. 28, 2020).

After nearly a year and a half of negotiations between the parties, Pls.' Mem. in Supp. Pls.' Mot. to Enforce J. ("Pls.' Mem.") at 1, ECF No. 101, CMS still had not calculated the total reimbursements owed, prompting plaintiffs to file, in December 2020, the instant motion for an order to enforce the August 2019 judgment and to direct HHS to "reimburse Plaintiffs for their dual eligible bad debts without any reduction for Medicaid liability," Pls.' Mot. to Enforce J. ("Pls.' Mot."), ECF No. 101. Less than a month after plaintiffs sought this enforcement order, CMS agreed to reimburse $18,656,588 in bad debt and $4,992,904 in associated interest for most plaintiffs. Def.'s Notice, Ex. 1 (Jan. 12, 2021 Letter from Susan Burris, Director of Cost Reporting Division, CMS, to Jason Healy, plaintiffs' counsel) ("CMS Letter"), at 1, ECF No. 104-1.

Remaining in dispute is $1,992,629 in unpaid claimed reimbursements, plus interest, that HHS has reduced or otherwise denied to eight plaintiff LTCHs located in five states—Alabama, Arkansas, Mississippi, Nebraska, and Wisconsin. Parties' Joint Status Report ¶ 5, ECF No. 105; *see also id.* ¶ 1; Pls.' Suppl. Mem. Supp. Mot. to Enforce J. ("Pls.' Suppl. Mem.") at 2, ECF No. 106. [2] HHS maintains that the disputed reimbursements do not reflect a "federal obligation,"

---

[2]     Although reimbursement payments to nine LTCHs were initially denied, in whole or part, by CMS, *see* CMS Letter at 3, one of those nine—plaintiff Select Specialty Hospital–Jackson, Inc.—ultimately received full reimbursement and no longer seeks relief through the instant motion to enforce, Pls.' Suppl. Mem. at 9.

Def.'s Resp. Pls.' Suppl. Mem. Supp. Mot. to Enforce J. ("Def.'s Suppl. Opp'n") at 5, ECF No.

109, but instead account for what state Medicaid programs would have been required to

contribute pursuant to their cost-sharing obligations under the corresponding state Medicaid

plans.  Plaintiffs, for their part, insist that reducing bad debt reimbursement based on any

"perceived Medicaid liability" flouts the Court's judgment holding that their receipt of

reimbursement for the claims at issue could not be preconditioned on complying with the must-

bill and RA requirements.  Pls.' Suppl. Mem. at 4.

To effectuate the judgment of *Select Specialty I*, CMS cannot withhold or reduce

reimbursement for bad debt claims that plaintiffs incurred while they were non-participants in

state Medicaid programs during the 2005 to 2010 period at issue.  Doing otherwise essentially

denies plaintiffs the relief awarded to them in *Select Specialty I*, which held that CMS acted

unlawfully in subjecting plaintiffs, while they were not enrolled in state Medicaid programs, to a

new requirement of "Medicaid participation" (through the sudden imposition of the must-bill

policy and RA requirement) without notice-and-comment.  *See Select Specialty I*, 391 F. Supp.

3d at 70.  No aspect of the Court's judgment, however, prevents CMS from withholding or

reducing reimbursements for claims that accrued *after* plaintiffs enrolled in state Medicaid

programs and were the responsibility of those state Medicaid programs.  Accordingly, for

reasons set forth in detail below, plaintiffs' motion to enforce judgment will be granted in part

and denied in part.

## I.      BACKGROUND

The statutory, regulatory, factual, and procedural background for this case is fully set out

in *Select Specialty I*, 391 F. Supp. 3d at 56–66, and *Select Specialty II*, 2019 WL 5697076, at *1–

3, and thus only the background necessary to resolving the instant motion is summarized below.

### A.      Statutory and Regulatory Background

"Medicare is a federally funded program that reimburses healthcare providers for delivering medical care to qualifying elderly and disabled individuals," whereas "Medicaid is a cooperative-federal state program—administered by states, and subject to federal guidelines—that pays for medical care provided to eligible low-income individuals." *New LifeCare Hosps. of N.C., LLC v. Becerra*, 7 F.4th 1215, 1219 (D.C. Cir. 2021) (citations omitted). [3]  The federal government covers most of the costs incurred for the care provided to Medicare patients, who nonetheless continue to be responsible for both deductible and coinsurance payments for hospital care. *See* 42 U.S.C. § 1395e; 42 C.F.R. §§ 409.82, 409.83.  Individuals eligible for both Medicare and Medicaid ("dual-eligible patients"), however, often lack the financial means "to afford the coinsurances and deductibles required of them under Medicare." *New LifeCare Hosps.*, 7 F.4th at 1219.  In such circumstances, the unpaid obligations, or bad debts, of these dual-eligible patients may be charged to a state Medicaid agency if required by that state's

---

[3]        In *New LifeCare Hosps.*, the D.C. Circuit recently considered a similar challenge, brought by LTCHs located in North Carolina, Pennsylvania, Texas, and Louisiana, to CMS's enforcement of the must-bill policy and subsequent denial of bad-debt reimbursement.  *See* 7 F.4th at 1219.  Like the *Select Specialty I* plaintiffs, the *New LifeCare Hosps.* plaintiffs argued, *inter alia*, that CMS's enforcement of the policy was unlawful because it required notice-and-comment rulemaking under the Medicare Act.  *See id.* at 1222.  The Circuit rejected that argument, finding that plaintiffs failed to establish they experienced a change in the must-bill policy's enforcement beginning in 2008.  *See id.* at 1222 ("The problem for the hospitals is that they identify no change in CMS policy taking place in 2008.").  The Circuit distinguished this Court's ruling in *Select Specialty I* on grounds that "*Select* involved a different administrative record."  *Id.* at 1224.  Specifically, the administrative records of the instant case and *New LifeCare Hosps.* differed in that the *New LifeCare* "[p]roviders have not proven that the contractors, in the past, *did* reimburse them for bad debts without requiring RAs" and therefore "have not shown a change, abrupt or otherwise" in CMS's enforcement of the must-bill policy and RA requirement.  *New LifeCare Hosps. of N.C. LLC v. Azar*, 416 F. Supp. 3d 11, 21 (D.D.C. 2019) (emphasis in original); *see id.* at 21-22 (explaining that the *Select Specialty I* plaintiffs presented evidence of CMS's "abrupt change" in policy, such as "a pre-2007 Adjustment Report that showed no deductions were made for failure to comply with the must-bill policy" and "emails from the CMS contractors to plaintiffs, confirming that CMS's application of the must-bill policy was a change in policy," whereas the *New LifeCare Hosps.* providers "failed to develop a similar record . . . confirming that there was a change in policy around this time").  The Circuit's holding in *New LifeCare Hosps.* thus is immaterial to resolving the instant motion to enforce—and the parties do not argue otherwise—because the Circuit's decision was predicated on a different administrative record and this Court's inquiry is limited to the record before it.  *See CTS Corp. v. EPA*, 759 F.3d 52, 64 (D.C. Cir. 2014) (observing that in administrative law cases "a reviewing court should have before it neither more nor less information than did the agency when it made its decision").

Medicaid program.  *See id.* (citing *Grossmont Hosp. Corp. v. Burwell*, 797 F.3d 1079, 1081 (D.C. Cir. 2015).  Only when states do "not cover the deductibles and coinsurances of dual-eligible patients through Medicaid" can "healthcare providers . . . seek reimbursement through Medicare." *Id.* (citing 42 C.F.R. § 413.89).  Thus, if a state Medicaid program is "obligated either by statute or under the terms of its plan to pay all, or any part, of the Medicare deductible or coinsurance amounts, those amounts are not allowable as bad debts under Medicare."  CMS Provider Reimbursement Manual Part I § 322 (1967).  Conversely, a bad debt that "the State is *not* obligated to pay can be included as a bad debt under Medicare," provided that other conditions not at issue here are met.  *Id.* (emphasis added).[4]

To implement the statutory requirement that state Medicaid programs determine their cost-sharing obligations regarding Medicare deductible and coinsurance amounts payable by dual-eligible beneficiaries, CMS adopted a must-bill policy, which requires hospitals to "(1) bill the state Medicaid program to determine whether Medicaid will cover the bad debts first, and (2) obtain a document known as a remittance advice ('RA') indicating whether the state refuses payment, before seeking reimbursement under Medicare."  *New LifeCare Hosps.*, 7 F.4th at 1220 (citations omitted).  HHS explains that, due to this statutory directive, CMS, "[e]ven absent the must-bill policy and the RA requirements . . . must still consider states' liabilities for Medicare cost-sharing in order to determine the amount of Plaintiffs' bad debt reimbursement due from the federal government."  Def.'s Opp'n to Pls.' Mot. to Enforce J. (Def.'s Opp'n") at 12, ECF No. 102.

---

[4]    CMS may reimburse Medicare providers only for "allowable" bad debts.  42 C.F.R. § 413.89(e).  A bad debt is allowable and therefore reimbursable by Medicare if (1) the debt is "related to covered services and derived from deductible and coinsurance amounts," (2) if "[t]he provider [is]. . . able to establish that reasonable collection efforts were made," (3) if "[t]he debt was actually uncollectible when claimed as worthless," and (4) "[s]ound business judgment established that there was no likelihood of recovery at any time in the future."  *Id.* § 413.89(e)(1)-(4).

### B.   Factual Background

Before 2007, CMS generally "had not applied the must-bill policy and the concomitant RA requirement to the plaintiffs," as LTCHs, *Select Specialty I*, 391 F. Supp. 3d at 61, and "[b]illing state Medicaid programs was regarded as unnecessary, because the states were not liable for Medicare bad debts incurred at LTCHs," *id.* at 55.  As a result, "none of the plaintiffs participated in their respective state Medicaid programs," *id.* at 60, given that their participation had never been required to obtain reimbursement from Medicare.

In 2007, however, CMS "began denying [reimbursement] requests" from plaintiffs and "consistently cited the must-bill policy and the plaintiffs' lack of RAs as reasons for the denials." *Id.* at 61.  Reacting to these unanticipated denials, plaintiffs attempted to obtain RAs and enroll in their respective state Medicaid programs to qualify for reimbursement under the must-bill policy and RA requirement, *id.* at 63, but their efforts yielded little fruit.  When plaintiffs "began submitting bills to state Medicaid programs in which they were not enrolled, in an attempt to obtain RAs," they were typically rejected because they were "not, or could not, be enrolled in Medicaid."  *Id.*  Similarly, when plaintiffs "attempted to enroll in Medicaid for the limited purpose of obtaining RAs," they were either "unable to enroll," or were able to enroll but were still not able to obtain "the requisite RAs for earlier periods," as was the case for the majority of plaintiffs.  *Id.* at 63-64.  Beginning in 2007, CMS thus preconditioned plaintiffs' ability to obtain reimbursement for bad debts from dual-eligible patients on "Medicaid participation," despite the fact that plaintiffs were barred in many states from participating in Medicaid because of their status as long-term care facilities.  *See id.* at 70.

### C.   Procedural History

Plaintiffs instituted this lawsuit over a decade ago for reimbursement of dual-eligible bad debts claimed on their Medicare cost reports between 2005 and 2010 and denied by defendant

for failing to meet the must-bill policy.  *See Select Specialty I*, 391 F. Supp. 3d at 60.[5]

Summarized below is what happened thereafter.

### 1. *This Court's 2019 Ruling in* Select Specialty I

In August 2019, *Select Specialty I* granted plaintiffs' motion for summary judgment and

denied HHS's cross motion, because CMS was required under the Medicare Act, 42 U.S.C. §

1395hh(a)(2), to conduct notice-and-comment rulemaking before subjecting the non-Medicaid

participating plaintiffs to the must-bill and RA requirements.  *Select Specialty I*, 391 F. Supp. 3d

at 67.  Undergirding this holding was the determination that the must-bill policy and RA

requirement constituted a "change in a 'substantive legal standard,'" *id.* at 67, which, as defined

by the D.C. Circuit, "at a minimum[,] include[d] a standard that 'creates, defines, and regulates

the rights, duties, and powers of parties,'" for purposes of § 1395hh(a)(2), *id.* (quoting *Allina

Health Servs. v. Sebelius*, 863 F.3d 937, 943 (D.C. Cir. 2017) (quoting BLACK'S LAW

DICTIONARY (10th ed. 2014))).  CMS, without any prior notice, "changed not just the steps that

existing LTCHs must take, vis-à-vis CMS, to be reimbursed, but also changed whether such

entities must form contracts with third parties" like state Medicaid programs.  *Id*. at 69.

Specifically, the must-bill policy and RA requirement were found to be "substantive" because

---

[5]  Following the 2007 policy change and after an initial round of proceedings before the agency, plaintiffs first appealed CMS's denial of bad-debt reimbursement to this Court on August 12, 2010.  *See Select Specialty I*, 391 F. Supp. 3d at 65.  On March 26, 2012, plaintiffs were granted partial summary judgment "because the Administrator's decision may have failed to take into account the plaintiffs' legitimate reliance on prior interpretation, and remanded the case to the Administrator for reconsideration of the limited issue of whether Plaintiffs were justified in relying on CMS's prior failure to enforce the must-bill policy with respect to dual-eligible reimbursement claims from non-participating Medicaid providers."  *Id.* (citations omitted).  Four years later, in March 2016, CMS affirmed its previous decision to deny reimbursement, after which plaintiffs moved to reopen their case in this Court.  *Id.* at 65-66.  This case was then reassigned to the undersigned Chief Judge on February 10, 2017, *see* Minute Entry (Feb. 10, 2017), and was afterwards stayed for ten months as the parties unsuccessfully attempted to settle, *see* Minute Entry (Dec. 18, 2018).  Summary judgment briefing was ultimately completed in late May 2019.  *See* Minute Entry (Jan. 10, 2019).

they "essentially changed the eligibility criteria for reimbursement under the Medicare Act for dual-eligible patients[] by requiring provider participation in the state Medicaid program." *Id.*

After the ruling in *Select Specialty I* issued, the parties filed two motions: HHS sought reconsideration of the decision, arguing that CMS's "sudden application of the must-bill and RA requirements" did not amount to a change in policy, *Select Specialty II,* 2019 WL 5697076, at *4, whereas plaintiffs sought an "order amending the earlier judgment to include an award of prejudgment interest," *id.* at *3. Again, HHS's motion was denied and plaintiffs' motion granted. *Id.* at *7 (concluding that "[w]hile the Secretary must still determine on remand the amounts to which plaintiffs are entitled, plaintiffs are entitled to prejudgment interest on those amounts as a matter of right"). HHS then, in January 2020, appealed this denial of reconsideration to the D.C. Circuit, but ten days later voluntarily dismissed that appeal. *See Select Specialty Hosp.-Denver, Inc. v. Azar*, 391 F. Supp. 3d 53 (D.D.C. 2019), *appeal dismissed* No. 20-5004 (D.C. Cir. Jan. 28, 2020).

### 2. *The Pending Motion to Enforce Judgment*

Between January 2020 and November 2020, the parties exchanged data and discussed the amounts owed on remand, Def.'s Opp'n at 6, eventually agreeing on "the calculations of allowable bad debt amounts and the rate of court-ordered interest the Defendant owes Plaintiffs," Pls.' Reply Supp. Mot. Enforce J. ("Pls.' Reply") at 1–2, ECF No. 103. The parties reached an impasse, however, "as to whether Defendant may reduce the amounts owed to Plaintiffs to account for the amounts that state Medicaid programs may have paid Plaintiffs toward the dual eligible bad debts at issue," Pls.' Mem. at 1, prompting plaintiffs to file the pending motion to enforce judgment. HHS initially opposed this motion as premature because no "final, reviewable agency action on the amounts payable under the Court's remand order" had been issued and "the

agency ha[d] not yet been afforded the opportunity to effectuate payment using the most accurate methods at its disposal."  Def.'s Opp'n at 8.

On January 13, 2021, HHS notified the Court that the "administrative process ha[d] . . . concluded" and that CMS would, by February 5, 2021, "issue payments to Plaintiffs," Def.'s Notice at 2, in accordance with CMS's calculations of the "appropriate amount of payment," *id.* at 1-2.  CMS subsequently reimbursed plaintiffs in the amount of $18,656,588, plus $4,992,904 in interest.  *See* CMS Letter at 4.  CMS, however, withheld $1,992,629 in principal, plus interest, from the eight LTCH-plaintiffs in five states that now seek reimbursement through the pending motion to enforce.  *See* Pls.' Suppl. Mem. at 6–10.  In the wake of CMS's 2007 policy shift, each of these plaintiffs faced a variety of bureaucratic hurdles to participate in their state Medicaid programs, which hurdles were likely exacerbated by CMS's implementation of the policy change without the requisite notice and comment that would have alerted plaintiffs and the states in which they are located to the then-newly required contractual relationship between LTCHs and state Medicaid programs.[6]  The situation in each of the five states where the eight LTCH plaintiffs are located is as follows:

*Alabama*: Plaintiff Select Specialty Hospital-Birmingham unsuccessfully attempted to enroll in Alabama Medicaid after 2007.  In December 2008, "Alabama Medicaid sent a rejection letter . . . indicating that Alabama Medicaid does not enroll LTCHs."  *Select Specialty I*, 391 F. Supp. 3d at 63.  The administrative record contained "ample evidence" that the Alabama plaintiffs could not enroll in their state's Medicaid program, *id*. at 64, and is devoid of any

---

[6]      Following receipt of CMS's January 2021 Notice outlining these reductions to plaintiffs' reimbursements, the parties were directed to file supplemental briefs providing "a precise description of how defendant has failed to comply with [*Select Specialty I*] with respect to the disputed non-payments."  *See* Minute Order (Feb. 14, 2021).

indication that this plaintiff was ever permitted to enroll in Alabama Medicaid during the 2005-2010 billing period at issue.

Plaintiff Select Specialty Hospital-Birmingham has received a reimbursement payment in the amount of $587,886, *see* CMS Letter at 4, but CMS withheld $7,343, plus interest, on grounds that Alabama Medicaid required the state to pay the deductible amounts for dual-eligible bad debt claims incurred during the period at issue, *see id.* at 2.

*Arkansas*: The four plaintiffs from Arkansas—Specialty Hospital-Little Rock, Select Specialty Hospital-Fort Smith, Select Specialty Hospital-Little Rock/BMC, and Select Specialty Hospital-Pine Bluff—"attempted to enroll in Arkansas Medicaid [in November 2007] and initially received a rejection letter, dated February 14, 2008, citing various provisions of the Arkansas Code." *Select Specialty I*, 391 F. Supp. 3d at 64. These plaintiffs, however, were eventually admitted to Arkansas Medicaid in either 2009 or 2010. *Compare id.* at 65 n.10 (noting that the Arkansas plaintiffs were admitted to Medicaid in 2010), *with* Pls.' Suppl. Reply Brief Supp. Mot. Enforce J. ("Pls.' Suppl. Reply") at 9, ECF No. 110 ("The Arkansas Plaintiffs obtained Medicaid provider agreements effective as of April 27, 2009.").

None of the four plaintiffs from this state have received any reimbursement from CMS because CMS posits that the state "had full responsibility" to pay both deductible and coinsurance amounts for dual-eligible patients under the Arkansas Medicaid State Plan. CMS Letter at 2. CMS has accordingly withheld $1,510,755, plus interest, from these plaintiffs. *Id.* at 3.

*Mississippi*: Plaintiff Select Specialty Hospital-Gulf Coast "tried to enroll in Mississippi Medicaid on November 11, 2008, but received a rejection letter dated May 26, 2009 advising that LTCHs in Harrison County, where this hospital was located, could not enroll" under the

Mississippi Code.  *Select Specialty I*, 391 F. Supp. 3d at 64.  The administrative record included "ample evidence" indicating that plaintiffs located in Harrison County, Mississippi "were unable to enroll in Medicaid . . . during the relevant period because of their status as LTCHs."  *Id.*  The record is devoid of any indication that this plaintiff was ever permitted to enroll in Mississippi Medicaid during the period at issue.

Plaintiff Select Specialty Hospital-Gulf Coast has received reimbursement in the amount of $800,326, *see* CMS Letter at 4, but CMS withheld an additional $76,376 because CMS posits that Mississippi Medicaid had "full responsibility to pay . . . for claims on or after January 1, 2010," *id.* at 2.

*Nebraska*: Plaintiff Select Specialty Hospital-Omaha sought to enroll in Nebraska Medicaid following the 2007 policy change, but its enrollment did not become effective until March 1, 2008.  *See* Pls.' Suppl. Mem. at 9 (citing S2-AR at 212, 317).  This plaintiff has not received any payment from CMS because CMS asserts that the state "had full responsibility" to pay both deductible and coinsurance amounts for dual-eligible patients under the Nebraska Medicaid State Plan.  CMS Letter at 2.  CMS has accordingly withheld $346,852, plus interest, from this plaintiff.  *Id.* at 3.

*Wisconsin*: Plaintiff Select Specialty Hospital-Madison did not receive approval to join Wisconsin Medicaid until August 27, 2008, with an effective date of December 17, 2007.  Pls.' Suppl. Mem. at 10 (citing S2-AR at 167-170).  This plaintiff has not received any reimbursement from CMS, which is withholding $51,303, plus interest, because CMS posits that the state was fully responsible for both deductible and coinsurance claims under the Wisconsin Medicaid State Plan during the period at issue.  CMS Letter at 2, 3.

***

The quest for bad debt reimbursement for the eight plaintiffs involved in the current motion was far from finished even after some of them were permitted to enroll in their state Medicaid programs. Notwithstanding their Medicaid registration, state Medicaid agencies refused to process plaintiffs' bad debt reimbursement requests for claims incurred *prior* to their Medicaid enrollment approval. *See Select Specialty I*, 391 F. Supp. 3d at 64 (citing S2-AR at 457 (Stipulations ¶8: "In no state could the Providers . . . obtain Medicaid RAs for dates of service when the Providers were not enrolled in Medicaid.")). Lacking an avenue to reimbursement even with state Medicaid enrollment, the 2007 shift in CMS's enforcement of the must-bill policy and RA requirement left plaintiffs "holding the proverbial bag of unreimbursed bad debt." *Id.* at 64. [7] Nevertheless, according to CMS, the reductions in payments made to their

---

[7]     Following this Court's 2019 ruling in *Select Specialty I*, HHS submitted the must-bill policy to notice-and-comment rulemaking and has undertaken additional actions that appear geared at preventing CMS and state Medicaid programs from putting medical providers servicing dual-eligible patients through the same "bureaucratic nightmare," *Select Specialty I*, 391 F. Supp. 3d at 70, experienced by plaintiffs here.

    First, on October 1, 2020, CMS issued a final rule, now codified at 42 C.F.R. § 413.89(e)(2)(iii)(A), "to clarify and codify our longstanding" must-bill policy to receive Medicare reimbursement for dual-eligible bad debts, "a provider that has furnished services to a dual eligible beneficiary must determine whether the State's Title XIX Medicaid Program . . . is responsible to pay all or a portion of the beneficiary's Medicare deductible and/or coinsurance amounts" by first submitting a bill to the state Medicaid agency. Fed. Reg. 58,432, 59,001 (Sept. 18, 2020); *see id.* at 58,990 ("[W]e believe it is appropriate to clarify certain Medicare bad debt policies that have been the subject of litigation, and generated interest and questions from stakeholders over the past several years."). CMS has also issued a rule establishing a mechanism for providers to seek Medicare reimbursement for dual-eligible bad debts even "[w]hen, through no fault of the provider, a provider does not receive a Medicaid remittance advice because the State does not permit a Medicare provider's Medicaid enrollment for the purposes of processing a beneficiary's claim, or because the State does not generate a Medicaid remittance advice." 42 C.F.R. § 413.89(e)(2)(iii)(B); *see also* Fed. Reg. 58,432, 59,001 (Sept. 18, 2020) ("Some States' noncompliance with the statutory requirement to process Medicare crossover claims and produce a Medicaid RA have resulted in numerous appeals filed by providers whose claims for reimbursement of unpaid Medicare cost sharing from services provided to dual eligible beneficiaries were denied for Medicare bad debt reimbursement because the State did not process the Medicare crossover claim and issue a Medicaid RA to the provider.").

    Most recently, on May 10, 2021, CMS published a notice of proposed rulemaking concerning LTCH payments that intends "[t]o clarify states' obligations regarding claims for Medicare cost-sharing by adding a new paragraph (d) to 42 C.F.R. 455.410 to specify in regulation how states must meet this obligation." Notice of Proposed Rule, *Medicare Program; Hospital Inpatient Prospective Payment Systems for Acute Care Hospitals and the Long-Term Care Hospital Prospective Payment System and Proposed Policy Changes and Fiscal Year 2022 Rates; Quality Programs and Medicare Promoting Interoperability program Requirements for Eligible Hospitals and Critical Access Hospitals; Proposed Changes to Medicaid Provider Enrollment; and Proposed Changes to the Medicare Shared Savings Program*, Fed. Reg. 25,070, 25,655 (May 10, 2021). The notice proposes that "State

bad debt reimbursement are justified because "states are required to determine their cost sharing obligations" for bad debt claims from dual Medicare-Medicaid patients and, in accordance with the Provider Reimbursement Manual, "any Medicare deductible and coinsurance amount that is payable by a state, under its Medicaid program, must be excluded from the computation of allowable Medicare bad debt reimbursable by the federal government."  CMS Letter at 1.

To calculate the contested reimbursement reductions, CMS looked to the Medicaid State Plans as the "definitive source for establishing the [dual-eligible patient] cost sharing obligations" of the five states where the eight LTCH-plaintiffs are located.  *Id.*[8]  Medicaid State Plans use a series of "policy codes" to indicate their cost-sharing policy for dual-eligible bad debt claims, including: (1) a Medicare Rate (MP) policy code, which indicates that the state is required to pay "the full Medicare deductible, coinsurance, or both amounts," *id.*; (2) a State Plan Rate (SP) code, which indicates that "the state generally may be responsible to pay a portion of, or none of the cost sharing amount, depending on their approved Medicaid rate setting methodology," *id.*; and (3) a Negotiated Rate (NR) code, which indicates that "the state has established its own methodology to pay a portion of, or none of the cost sharing amount," *id.* at 2.

---

Medicaid programs must accept enrollment of all Medicare-enrolled providers and suppliers (even if a provider or supplier is of a type not recognized as eligible to enroll in the State Medicaid program) if the provider or supplier otherwise meets all Federal Medicaid enrollment requirements" so that "[s]tates [will] process claims from such providers requesting that the State determine its cost-sharing liability."  *Id.*  This change, according to CMS, was occasioned by the phenomenon at issue here, where "Medicare-enrolled provider[s] or supplier[s] ha[ve] been unable to enroll with the State Medicaid program, [so] . . . the State [Medicaid Management Information System] may not adjudicate the cost-sharing claim and also may not return a Medicaid RA to the provider for the purpose[] of computing Medicare bad debt absent further actions by the State or by the provider."  *Id.*

[8]     A Medicaid State Plan "is a comprehensive written statement submitted by the [state Medicaid] agency describing the nature and scope of its Medicaid program" and which "contains all information necessary for CMS to determine whether the plan can be approved to serve as a basis for Federal financial participation . . . in the State program."  42 C.F.R. § 430.10.

After reviewing the Medicaid State Plans and relevant policy codes for the five states where plaintiffs are located, CMS concluded that reimbursement for the Alabama and Mississippi plaintiffs had to be reduced because the Medicaid plans for those states used the Medicare Rate policy code and, consequently, required Alabama Medicaid to cover deductible claims in their totality, and Mississippi Medicaid to cover all claims (whether coinsurance or deductibles) incurred on or after January 1, 2010.  *Id.*  For plaintiffs' claims in Arkansas, Nebraska, and Wisconsin, CMS similarly determined that they were governed by the Medicare Rate policy code and thus the states "had full responsibility to pay both the . . . deductible and coinsurance amounts" for all bad debt claims that plaintiffs incurred during the 2005 to 2010 period.  *See id.* at 2, 4.

The eight LTCH-plaintiffs now challenge CMS's decision to withhold reimbursements and seek an order enforcing the judgment in *Select Specialty I* and directing that CMS "must not reduce the amounts owed to Plaintiffs for state Medicaid liability."  Pls.' Mem. at 6.  According to plaintiffs, *Select Specialty I's* "directive that CMS not apply the state billing and RA requirements when determining the amounts owed to Plaintiffs does not allow for CMS to consider Medicaid liability when effectuating the Court's judgment."  *Id.*  CMS, for its part, maintains that "any reduction of Plaintiffs' Medicare reimbursement to account for state Medicaid liability would be entirely lawful and completely consistent with the Court's decisions in this case."  Def.'s Opp'n at 11.  CMS further asserts that it "has not applied the must-bill and RA requirements again on remand" but has instead "performed the completely separate operation of determining the amounts due without application of those requirements, which precluded payment altogether."  Def.'s Suppl. Opp'n at 4.

## II.   LEGAL STANDARD

"District Courts have the authority to enforce the terms of their mandates." *Salazar v. District of Columbia*, 236 F. Supp. 3d 411, 413 (D.D.C. 2017).  "[A] motion to enforce is the usual method for requesting a court to interpret its own judgment and to compel compliance if necessary in light of that interpretation." *Burns v. Anderson*, No. 16-mc-02509 (TNM), 2021 WL 1840368, at *2 (D.D.C. May 7, 2021) (citing *Anglers Conservation Network v. Ross*, 387 F. Supp. 3d 87, 93 (D.D.C. 2019)).  A district court's exercise of its authority to enforce its judgments "is particularly appropriate in a case . . . where an administrative agency plainly neglects the terms of a mandate, and the case then returns to the court—under the same docket number and involving the same parties—on a motion to enforce the original mandate." *Int'l Ladies' Garment Workers' Union v. Donovan*, 733 F.2d 920, 922 (D.C. Cir. 1984).  Indeed, "[t]he court is generally the authoritative interpreter of its own remand," *AT&T Wireless Servs., Inc. v. FCC*, 365 F.3d 1095, 1099 (D.C. Cir. 2004), and "[i]n performing this analysis, it is guided not only by the text of the Order in question but also by its relevant opinions*," Resolute Forest Prods. v. USDA*, 427 F. Supp. 3d 37, 41 (D.D.C. 2019) (citations omitted).  Success on a motion to enforce a judgment, however, allows a plaintiff only "the relief to which the plaintiff is entitled under its original action and the judgment entered therein." *Heartland Reg'l Med. Ctr. v. Leavitt*, 415 F.3d 24, 29 (D.C. Cir. 2005) (quoting *Watkins v. Washington*, 511 F.2d 404, 406 (D.C. Cir. 1975)).

## III.   DISCUSSION

The remaining dispute between the parties is limited to whether CMS's reimbursement reductions for the eight LTCH-plaintiffs in Alabama, Arkansas, Mississippi, Nebraska, and Wisconsin are consistent with the Court's direction that the CMS Administrator "reconsider whether, absent the must-bill and RA requirements, the plaintiffs are entitled to bad debt

reimbursement." *Select Specialty I*, 391 F. Supp. 3d at 70.  Plaintiffs argue that these reductions are impermissible, emphasizing that this Court's instructions on remand directed CMS to not "reduce Plaintiffs' bad debt amounts owed by what [it] thinks the state Medicaid programs would have paid *if* Plaintiffs had (1) enrolled in Medicaid, (2) timely billed the Medicaid programs, and (3) obtained valid Medicaid RAs with state payment determinations."  Pls.' Suppl. Mem. at 4–5 (emphasis in original).  CMS counters that it was not barred, under *Select Specialty I*, from considering whether "[the] states [were] responsible for certain cost-sharing amounts." Def.'s Suppl. Opp'n at 3.  Both sides are partially right.

For the reasons explained below, plaintiffs' motion to enforce the judgment will be granted in part and denied in part.  In effectuating this Court's judgment, plaintiffs are correct that CMS cannot reduce reimbursements based on perceived Medicaid liability for claims incurred while plaintiffs were not enrolled in Medicaid during the billing years at issue. Nevertheless, nothing in *Select Specialty I* precludes CMS from decreasing reimbursements on the same basis for claims that plaintiffs incurred after becoming state Medicaid program registrants.

A.    **Reimbursement for Claims Incurred *Before* Plaintiffs Enrolled in Medicaid**

*Select Specialty I* presented an unambiguous command: CMS "could not, and indeed cannot, impose the must-bill policy and RA requirement on the plaintiffs for the period *when they were non-Medicaid-participating providers*."  391 F. Supp. 3d at 70 (emphasis added).  As recently explained by the D.C. Circuit, complying with the must-bill policy and RA requirement requires that medical providers "(1) bill the state Medicaid program to determine whether Medicaid will cover the bad debts first, and (2) obtain a document known as a remittance advice ('RA') indicating whether the state refuses payment, before seeking reimbursement under Medicare."  *New LifeCare Hosps.*, 7 F.4th at 1220 (citations omitted).  The must-bill policy and

RA requirement thus impose a degree of "state Medicaid participation . . . that the LTCHs [have] to satisfy for reimbursement to occur." *Select Specialty I*, 391 F. Supp. 3d at 70.  By withholding or decreasing reimbursements based on purported Medicaid liability for periods in which plaintiffs were not state Medicaid program participants, CMS is again subjecting plaintiffs to the must-bill policy and RA requirement, both of which are predicated on participating in and billing state Medicaid programs.  Such an approach neglects the core holding of this Court's judgment.

*Select Specialty I* invalidated the application of the must-bill policy and RA requirement to plaintiffs during their period as non-Medicaid participants because, under the Medicare Act, CMS should have first engaged in notice-and-comment before imposing "participation in the state Medicaid program" as a requisite for dual-eligible bad debt reimbursement when such Medicaid participation was not previously required.  *Id.* at 69.  Indeed, as plaintiffs reiterate and this Court has noted, before 2007, CMS "did not reduce Medicare reimbursement to Plaintiffs for their dual eligible bad debts to account for state Medicaid liability."  Pls.' Reply at 14; *see also Select Specialty I*, 391 F. Supp. 3d at 55 ("Prior to 2007, [CMS] had reimbursed LTCHs for their dual-eligible patients' unpaid co-insurance and deductible obligations . . . without requiring the LTCHs to bill state Medicaid programs for a formal determination of how much of that bad debt would be covered by state Medicaid programs.").  This was the *status quo ante* that *Select Specialty I* sought to preserve for plaintiffs during the billing periods at issue, when many were not permitted to enroll in state Medicaid programs because of their LTCH status and those permitted to enroll were barred from billing the states for their bad debt claims preceding their Medicaid enrollment dates.  *See Select Specialty I*, 391 F. Supp. 3d at 69.  CMS's 2007 shift in policy therefore put plaintiffs in an impossible position in which they could not comply with the new Medicaid billing requirements even after endeavoring to do so, and *Select Specialty I* held

that plaintiffs could not be penalized as a result due to the agency's failure to engage in notice-and-comment.  The agency's arguments to the contrary—asserting that it enjoys *carte blanche* to deny or reduce reimbursements based on *any* perceived Medicaid liability accrued during the billing years at issue—are unavailing and driven by an improperly reductive reading of *Select Specialty I*. [9]

According to CMS, "any reduction of Plaintiffs' Medicare reimbursement to account for state Medicaid liability would be entirely lawful and completely consistent with the Court's decision," Def.'s Opp'n at 11, in part, because CMS was not ordered to make payment in any specific amount to any plaintiff, with that determination left to the agency, *see id.* at 9-10. Instead, CMS asserts the Court "*simply* instructed the agency 'to reconsider whether, absent the must-bill and RA requirements, the plaintiffs are entitled to bad debt reimbursement.'"  Def.'s Suppl. Opp'n at 4 (citing *Select Specialty I*, 391 F. Supp. 3d at 70) (emphasis added).  This reductionist view of the Court's order treats the must-bill policy and RA requirement as a "mere change in procedure," without substantive consequences, that demanded of the plaintiffs nothing more than checking off two boxes on their way to receiving bad debt reimbursement.  *See Select Specialty I*, 391 F. Supp. 3d at 69.  CMS ignores, however, that the must-bill policy and RA requirement, "even if superficially appearing to be merely procedural, had significant substantive consequences . . . [,]essentially changed the eligibility criteria for reimbursement under the Medicare Act for dual-eligible patients . . . [and] newly require[d] LTCHs to assume some form of Medicaid participation."  *Id.* at 69-70.

---

[9]     CMS necessarily backs off on its original opposing argument that plaintiffs' motion should be denied as premature because the agency "has not yet been afforded the opportunity to effectuate payment," Def.'s Opp'n at 8, because HHS has now issued the payments and "concluded . . . [the] administrative process," Def.'s Notice at 2.

CMS also insists that the reimbursement reductions "stem not from an application of the must-bill or RA policies, but from a calculation of the amounts for which states were responsible pertaining to each Plaintiff's bad debt claims." Def.'s Suppl. Opp'n at 5. This representation creates a distinction that *Select Specialty I* made clear does not exist because "[t]o bill state Medicaid programs and obtain RAs, providers must now necessarily participate in state Medicaid programs, even though Medicaid participation is not a condition of participation or payment for purposes of Medicare reimbursement." *Specialty I*, 391 F. Supp. 3d at 69. Put differently, "applying" the must-bill policy and RA requirement to plaintiffs would have resulted in state Medicaid programs determining what responsibility they had, if any, for the bad debts at issue. *See New LifeCare Hosps.*, 7 F.4th at 1220 (explaining that the must-bill policy requires providers "to bill the state Medicaid program to determine whether Medicaid will cover the bad debts first"). *Select Specialty I* held that the Medicare Act did not permit CMS to require this degree of Medicaid participation from plaintiffs while they were not enrolled in their respective state Medicaid programs if the agency first did not engage in notice-and-comment. *See* 391 F. Supp. 3d at 70. For CMS now to deny reimbursement in complete disregard of plaintiffs' Medicaid enrollment status and declare that "[n]othing about the payments issued here implicates the Plaintiff providers' state Medicaid participation," Def.'s Suppl. Opp'n at 4, indisputably defies the judgment and order in *Select Specialty I*.

Accordingly, CMS is directed on remand to consider whether the eight plaintiffs are entitled to bad debt reimbursement *without* withholding or reducing any such reimbursement based on purported Medicaid liability incurred when plaintiffs were *not* enrolled in state Medicaid programs during the relevant fiscal years. For plaintiffs that were ultimately able to enroll in Medicaid, this includes reimbursement requests billed to, but rejected by, state

Medicaid programs as pre-dating plaintiffs' Medicaid enrollment dates.  *See Select Specialty I*, 391 F. Supp. 3d at 64 (citing S2-AR at 457 (Stipulations ¶8: "In no state could the Providers . . . obtain Medicaid RAs for dates of service when the Providers were not enrolled in Medicaid.")).

For example, the two plaintiffs located in Alabama and Mississippi "were unable to enroll in Medicaid . . . during the relevant period because of their status as LTCHs."  *Id.* at 64.  Nonetheless, CMS has denied $7,343, plus interest, to the Alabama plaintiff (Select Specialty Hospital-Birmingham) on grounds that Alabama Medicaid was responsible for deductible amounts of dual-eligible bad debt claims during the period at issue, and withheld $76,736 from the Mississippi plaintiff (Select Specialty Hospital-Gulf Coast) because Mississippi Medicaid had "full responsibility to pay . . . for claims on or after January 1, 2010."  *See* CMS Letter at 2-3.  In implementing *Select Specialty I*, CMS may not deny these payments solely because of perceived Medicaid liability during a period when both the Alabama and Mississippi plaintiffs—given their status as LTCHs—were ineligible to participate in their states' Medicaid programs.  Doing so would fail to comply with this Court's judgment that plaintiffs may not be held subject to a degree of Medicaid participation, without a period of notice-and-comment, that they simply could not assume as LTCHs under the Alabama and Mississippi Medicaid rules in place at the time.  *See Select Specialty I*, 391 F. Supp. 3d at 69-70.

By contrast, the six plaintiffs from Arkansas, Nebraska, and Wisconsin were each able to enroll in their respective state Medicaid programs during the relevant period.  The four Arkansas plaintiffs (Specialty Hospital-Little Rock, Select Specialty Hospital-Fort Smith, Select Specialty Hospital-Little Rock/BMC, and Select Specialty Hospital-Pine Bluff) were not admitted to Arkansas Medicaid until either 2009 or 2010.  *Compare Select Specialty I*, 391 F. Supp. 3d. at 65 n.10 (noting that the Arkansas plaintiffs were admitted to Medicaid in 2010), *with* Pls.' Suppl.

Reply at 9 ("The Arkansas Plaintiffs obtained Medicaid provider agreements effective as of April 27, 2009.").  Still, CMS has collectively denied these four providers $1,510,755, plus interest, asserting that Arkansas Medicaid "had full responsibility" for their bad debt claims, including those claims incurred in the fiscal years that preceded plaintiffs' Medicaid enrollment (whether that occurred in 2009 or 2010).  CMS Letter at 2-3; *see also id.* at 4 (noting as "$0" the reimbursements that CMS issued to the Arkansas plaintiffs for fiscal years 2005-2008).

Also asserting full state responsibility for the debts at issue, CMS is withholding all reimbursement from plaintiffs Select Specialty Hospital-Omaha in Nebraska, which enrolled in the state Medicaid program on March 1, 2008, *see* Pls.' Suppl. Mem. at 9 (citing S2-AR at 212, 317), and Select Specialty Hospital-Madison in Wisconsin, which became a state Medicaid participant on December 17, 2007, *id.* at 10 (citing S2-AR at 167-170); *see also* CMS Letter at 4 (noting as "$0" the reimbursements that CMS issued to the Nebraska and Wisconsin plaintiffs for fiscal years 2005-2007).  On remand, CMS must evaluate whether these six plaintiffs are entitled to any reimbursement for claims incurred *before* their Medicaid enrollment effective dates.[10]

## B.   Reimbursement for Claims Incurred *After* Plaintiffs Enrolled in Medicaid

Notwithstanding the foregoing, to fulfill *Select Specialty I's* mandate, CMS is not required to reimburse plaintiffs for claims incurred *after* their state Medicaid program enrollment

---

[10]   The parties also dispute whether the Nebraska plaintiff may receive reimbursement for bad debts "incurred from treating patients who were eligible for an out-of-state Medicaid program," Pls.' Suppl. Mem. at 10; *see also* Def.'s Suppl. Opp'n at 7, and the proper interpretation of the Wisconsin Medicaid State Plan, *see* Pls.' Suppl. Reply at 13; Def.'s Suppl. Opp'n at 7.  These arguments, which are presented for the first time on this motion to enforce, are beyond the scope of the ruling reached in *Select Specialty I* and may thus not be entertained at this stage.  *See Heartland Reg'l Med. Ctr.*, 415 F.3d at 24 (explaining that succeeding on a motion to enforce allows a plaintiff only "the relief to which the plaintiff is entitled under its original action and the judgment entered therein") (citations omitted); *Resolute Forest Prods., Inc.*, 427 F. Supp. 3d at 41 ("A motion to enforce the judgment does not provide a means for a court to reconsider its judgment or for a plaintiff to raise new arguments that should have been offered in prior proceedings.").

date, at which point forward the state Medicaid programs bear responsibility for sharing the costs.  CMS correctly points out that "the Court did not invalidate the premise that states may be responsible for certain cost-sharing amounts."  Def.'s Suppl. Opp'n at 3.  Again, the precise holding of *Select Specialty I* was that, "without satisfying the notice-and-comment obligation [under the Medicare Act], CMS could not, and indeed cannot, impose the must-bill policy and RA requirement on the plaintiffs for the period *when they were non-Medicaid-participating providers*."  391 F. Supp. 3d at 70 (emphasis added).  No aspect of that holding, or any other dimension of that decision, entitled plaintiffs to reimbursement for claims accrued *after* they became Medicaid participants in those states where the Medicaid programs would have been liable for a portion of such claims.

Although plaintiffs flatly assert they "were not enrolled in Medicaid during the periods at issue," Pls.' Mem at 4, the record establishes otherwise, revealing enrollment dates by 2010 for the Arkansas plaintiffs, *see Select Specialty I*, 391 F. Supp. 3d. at 65 n.10, Pls.' Suppl. Reply at 9; in March 2008 for the Nebraska plaintiff, *see* Pls.' Suppl. Mem. at 9; and in December 2007 for the Wisconsin plaintiff, *see id.* at 10.  This Court's judgment was limited to granting plaintiffs relief for their period as "non-Medicaid-participating providers," *Select Specialty I*, 391 F. Supp. 3d. at 70, not for bad debt claims that arose once plaintiffs became Medicaid registrants and had no obstacle to complying with the must-bill policy and RA requirement.  CMS is therefore not required, on remand, to grant the Arkansas, Nebraska, and Wisconsin plaintiffs reimbursement for claims incurred after their Medicaid enrollment dates and from which point forward should have been the responsibility of their state Medicaid programs, to the extent that the states' cost-sharing obligation can be clearly discerned by the agency.  *See New LifeCare Hosps.*, 7 F.4th at 1219 (explaining that only when states do "not cover the deductibles and

coinsurances of dual-eligible patients through Medicaid" can "healthcare providers . . . seek

reimbursement through Medicare" (citing 42 C.F.R. § 413.89)). [11]

## IV.    CONCLUSION

Consistent with the reasoning in *Select Specialty I*, CMS may not deny plaintiffs

reimbursement for claims incurred while they were non-participants in state Medicaid programs

during the billing periods at issue between 2005 and 2010.  Otherwise, the "bureaucratic

nightmare" that CMS created "by requiring a certain type of paperwork that the plaintiffs simply

could not provide without sufficient advanced notice" would be prolonged and the relief granted

to plaintiffs "for the period when they were non-Medicaid-participating providers" would be

nullified.  *Select Specialty I*, 391 F. Supp. 3d. at 70.  The current record makes plain that CMS

has denied plaintiffs all the relief required under the prior judgment by rejecting reimbursement

for claims arising when they were non-participants in state Medicaid programs, and thus their

motion to enforce is granted to that extent.  Nevertheless, *Select Specialty I* did not require CMS

to reimburse plaintiffs for bad debt claims incurred after plaintiffs enrolled in state Medicaid

programs to the extent the states' Medicaid plans were responsible for covering such claims.

HHS is correct that, for such claims, plaintiffs' recourse is to sue the appropriate state Medicaid

program rather to seek an order directing CMS to reimburse the eight plaintiffs for those claims

that are not "a federal obligation."  Def.'s Suppl. Opp'n. at 5.

Accordingly, plaintiffs' motion to enforce judgment is granted in part and denied in part.

An Order will be entered contemporaneously with this Memorandum Opinion.

---

[11]      Notably, this is the approach already adopted by CMS.  In its January 2021 Notice, CMS explained that, after reviewing the relevant Medicaid State Plans, it was unable to discern the state cost-sharing responsibility policy for six states (Kansas, Kentucky, Pennsylvania, Ohio, Oklahoma, and South Dakota).  CMS Letter at 2.  The agency thus decided to give "the 17 providers in these six states the benefit of the doubt," and remitted to them "the full allowable bad debt amounts without a state cost sharing liability reduction" totaling $2,743,006.  *Id.*

Date: September 20, 2021

_____
BERYL A. HOWELL
Chief Judge